NOS. 4-06-0562, 4-06-0596      Filed: 11/30/06

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: S.J., a Minor, | ) | Appeal from |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Champaign County |
| v.  (No. 4-06-0562) | ) | No. 03JA11 |
| MARK ROEMER, | ) | |
| Respondent-Appellant. | ) | |
| _____ | ) | |
| In re: S.J., a Minor, | ) | |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| Petitioner-Appellee, | ) | |
| v.  (No. 4-06-0596) | ) | Honorable |
| KIM SLATER, | ) | Holly F. Clemons, |
| Respondent-Appellant. | ) | Judge Presiding. |

JUSTICE COOK delivered the opinion of the court:

On August 30, 2005, the Champaign County trial court entered an order placing custody and guardianship of S.J. (born January 30, 2003) with his foster mother, Debra Faulkner. Respondents, Kim Slater, formerly known as Kim Johnson-Slater, and Mark Roemer, are S.J.'s biological parents, and each appealed the trial court's order. On appeal, we reversed and remanded, ordering that the trial court comply with section 2-28 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-28 (West 2004)). Upon remand, the trial court entered a revised order again placing permanent custody and guardianship of S.J. with Faulkner. Kim and Roemer appeal. We reverse and remand with directions.

I. BACKGROUND

The facts and procedural history of this case are fully set forth in our previous opinion (In re S.J., 364 Ill. App. 3d 432, 846 N.E.2d 633 (2006)) and will only be repeated as needed to resolve the issues presented in this appeal.

At the time of the trial court's August 30, 2005, order, S.J., who was then 2 1/2 years old, was living with his foster mother, Faulkner, whom he had been living with since he was 6 days old. S.J. had been removed from his biological mother, Kim, because he was neglected in that Kim continued to reside with her third husband, who had sexually molested Kim's daughters. Roemer, S.J.'s biological father and Kim's first husband, had been indicated for sexually molesting his stepdaughter and daughters. On January 11, 2005, the trial court set a permanency goal of returning S.J. home to Kim within five months as she had made reasonable efforts and progress. A month later, Faulkner filed a motion to intervene, which was granted. The court also granted Faulkner's motion for a bonding assessment.

Dr. Judy Osgood completed a bonding assessment and concluded that S.J. had a strong bond with Faulkner and a lesser bond with Kim. Dr. Osgood concluded that S.J. should remain with Faulkner as removing him could cause him to develop reactive-attachment disorder and posttraumatic stress disorder. Dr. Osgood recommended, though, that S.J. continue to have visits

with his biological family. The trial court held a permanency hearing in which it heard a great deal of testimony and evidence. On August 30, 2005, the court concluded that it was in S.J.'s best interest that his custody and guardianship be permanently transferred to Faulkner with continued visitation with his biological family as recommended by Dr. Osgood. Kim and Roemer appealed this decision.

Pending the outcome of this court's decision, the trial court held a hearing on November 7, 2005, regarding the guardianship of three of S.J.'s halfsiblings. The attorney for the half siblings requested that guardianship be returned to the Department of Children and Family Services (DCFS), as issues needed to be addressed that had arisen upon the children's return home and because the children needed to have their own individual counselor, not the same one Kim had. None of the parties objected to the request, as a change in guardianship allowed DCFS to provide and pay for necessary services. Guardianship was eventually switched to Kim.

At a hearing on January 23, 2006, Dr. Osgood, the author of the bonding assessment, submitted a letter to the trial court along with the foster-parent report. The letter suggested that visitation between Kim and S.J. be more limited and supervised. S.J.'s attorney requested that the court order a third party to attend certain interactions between S.J. and all

parties.  None of the parties objected to this suggestion.

On February 9, 2006, the trial court held a review hearing.  At the hearing, Roemer testified that Faulkner refused him a regularly scheduled visit with S.J. because Roemer had attended S.J.'s birthday party during Kim's court-ordered visitation.  Dr. Osgood testified about her recommendation that S.J.'s visits with his biological parents be reduced and supervised.  Dr. Osgood reported that since Osgood last testified, Faulkner had called her and come into her office on various occasions with concerns about S.J.'s behavior after the visits with his biological parents.  Aside from Faulkner's visits to her office, Dr. Osgood also went to Faulkner's home once to observe Faulkner and S.J.  Dr. Osgood opined that the difficulties Faulkner reported S.J. having were consistent with the concerns expressed in her previous testimony.  While Faulkner was the primary source of information concerning S.J.'s problems, Dr. Osgood also spoke with Dashon Jones, S.J.'s day-care worker, who also reported S.J. having problems after visits with his biological parents.  Dr. Osgood admitted that other things such as changes in S.J.'s routine could also be the cause of S.J.'s apparent stress.  Dr. Osgood also discussed the possibility of an independent third party observing S.J. and all of the parties.

On February 14, 2006, the trial court resumed the review hearing.  Kim's attorney submitted stipulated evidence

that a birthday party for S.J. had gone well.  In arguments to the court, Faulkner's attorney argued that as Faulkner was the custodian and guardian, she should be the one determining the time and length of the visits between S.J. and anyone else.  The other parties argued that visits should not be reduced and an independent person should observe S.J.'s interactions with the parties.  The court continued S.J.'s case to a status hearing.

At the status hearing, the trial court indicated that a University of Illinois student observer had been located to observe S.J. and the parties.  Arrangements for the observations were discussed.

This court's opinion in the first appeal was issued in March 2006 with our mandate scheduled to issue on April 25, 2006.  In our opinion, we found that the trial court failed to set a permanency goal and failed to comply with the requirements of section 2-28 of the Juvenile Court Act.  S.J., 364 Ill. App. 3d 432, 846 N.E.2d 633.

On March 7, 2006, the trial court held a brief hearing concerning the logistics for the independent observer and the parties' concerns.  On May 15, 2006, the trial court held a hearing wherein the parties reported that the observer had prepared a report but not all of the parties had the opportunity to fully review it.

On May 22, 2006, the trial court held a permanency

review hearing. Some off-the-record discussions were had apparently concerning this court's mandate. On the record, Roemer's attorney objected to the court considering previously adduced evidence. The court and S.J.'s attorney stated that based on our mandate, the court need only prepare a new order that satisfied section 2-28 of the Juvenile Court Act (705 ILCS 405/2-28 (West 2004)). The court did, though, set a hearing for July 6, 2006, in the event that any of the parties wished to present additional evidence.

The trial court entered a written formal order on June 8, 2006. In the written order, the court found that reasonable efforts had been made by DCFS to achieve the permanency goal and reasonable efforts and progress had been made by Kim and Roemer. Despite the reasonable efforts and progress, the court found Kim and Roemer unable, for reasons other than financial circumstances alone, to care for, protect, train, and discipline S.J. and placing S.J. with either of them would jeopardize his health, safety, and best interests. The court held that S.J. must remain in DCFS care because Kim and Roemer must complete counseling and continue to maintain stable lifestyles. As to Roemer, the court found he had health issues that had not been resolved and caused him significant pain. S.J.'s current placement with Faulkner was deemed necessary and appropriate to the current service goal and plan. Stating that it considered the factors specified in

section 2-28(2), the court found that the permanency goal that is in S.J.'s best interest is transfer of guardianship to Faulkner on a permanent basis (705 ILCS 405/2-28(2) (West 2004)). The court explained its reasons for this permanency goal as follows:

"the respondent minor has been in the care of Ms. Faulkner continuously since the beginning of February 2003, when he was a few days old. Due to the extensive period of time that he has spent in Ms. Faulkner's loving care, and the stability he has received there, [S.J.] has developed a very strong bond with Ms. Faulkner and her children. *** The court has numerous concerns with both biological parents that must be addressed. First, [Kim's] relationship with [Roemer] remains problematic and antagonistic. They continue to argue regularly. Second, the court has concerns with respect to [Kim's] credibility. In particular, the court has misgivings about [Kim's] ability to self-report incidents that would reflect adversely on her parenting skills. This, coupled with [S.J.'s] young age, two years old, make him especially vulnerable, because he has limited verbal skills, and his ability to

verbalize his concerns to another adult who could act on his behalf is questionable. Third, [Kim] lacks empathy, which is particularly essential in caring for a young child. Fourth, both respondent parents have violated court orders in the past. [Roemer] violated the De Witt County court's visitation order, and despite [Kim's] protestations, the court believes that this was done with her tacit approval. Fifth, although [Roemer] is engaged in individual counseling, and he is making progress, he ha[s] not fully addressed his issues. Sixth, he was indicated by DCFS for sexual abuse of S.J.'s siblings *** and [Kim] has stated that [S.J.] was conceived as a result of [Roemer] raping her. Dr. Osgood has opined that [S.J.] is at great risk of developing reactive[-]attachment disorder and post[]traumatic stress disorder if he is removed from [Faulkner's] care and from the family he had bonded with for years. He has demonstrated symptoms consistent with Dr. Osgood's diagnoses following visits with [Kim and Roemer]. For the foregoing reasons, the

court has eliminated the 'return home' goals. [705 ILCS 405/2-28(2)(A), (2)(B) (West 2004)]. While the court recognizes that respondent parent's [sic] parental rights remain intact, a return home would be psychologically devastating to the minor, and not in his best interest."

The court concluded that the goals of "short-term care with a continued goal to return home pending a status hearing" (705 ILCS 405/2-28(2)(B-1) (West 2004)) and "substitute care pending court determination on termination of parental rights" (705 ILCS 405/2-28(2)(C) (West 2004)) are inappropriate as Kim and Roemer have made reasonable efforts and progress. Further, the court stated the goal of "[a]doption" (705 ILCS 405/2-28(2)(D) (West 2004)) is not appropriate because parental rights remain intact. The court found no just reason to delay enforcement or appeal. Kim and Roemer both appealed.

## II. ANALYSIS

Kim and Roemer both argue on appeal that the trial court abused its discretion when it ruled out return home to Kim. Kim and Roemer allege that the court's finding that it was in S.J.'s best interest to transfer custody and guardianship of S.J. to Faulkner was against the manifest weight of the evidence.

Parental rights may be terminated only upon a finding

of unfitness, and such finding must be supported by clear and convincing evidence. In re D.T., 212 Ill. 2d 347, 352-53, 818 N.E.2d 1214, 1220 (2004). Under certain circumstances it is not necessary that the natural parent be found unfit if it is in the best interest of the child that he be placed in the custody of someone other than the parent. In re Austin W., 214 Ill. 2d 31, 51, 823 N.E.2d 572, 584 (2005). That is the case under section 2-28(2)(E) of the Juvenile Court Act (705 ILCS 405/2-28(2)(E) (West 2004)), but the court must follow other procedural requirements of the Act, first ruling out any return home possibilities. In re Custody of T.W., 365 Ill. App. 3d 1075, 1083-84, 851 N.E.2d 881, 889 (2006).

As we stated in the first appeal, we review the trial court's best-interest determination under the manifest-weight-of-the-evidence standard. S.J., 364 Ill. App. 3d at 441, 846 N.E.2d at 641, citing Austin W., 214 Ill. 2d at 51-52, 823 N.E.2d at 585. We further noted in the previous appeal, that "[i]t is well settled that a parent has superior rights to the care and custody of a child, unless the child is placed elsewhere due to an adjudicated finding that the parent abused or neglected the child." S.J., 364 Ill. App. 3d at 442, 846 N.E.2d at 641, citing In re J.J., 327 Ill. App. 3d 70, 77, 761 N.E.2d 1249, 1255 (2001); In re S.S., 313 Ill. App. 3d 121, 132, 728 N.E.2d 1165, 1174 (2000). We recognize a biological parent's superior right

- 10 -

to the custody of her child but acknowledge that in a custody case the natural parent's right must "yield to the best interests of the child." S.J., 364 Ill. App. 3d at 442, 846 N.E.2d at 641, citing In re J.K.F., 174 Ill. App. 3d 732, 733, 529 N.E.2d 92, 93 (1988).

In S.J., we acknowledged that a trial court may determine that it is in a minor's best interest to place custody of that minor with someone other than a "fit" biological parent, but that court must comply with section 2-28 of the Juvenile Court Act (705 ILCS 405/2-28(1) (West 2004)). S.J., 364 Ill. App. 3d at 442, 846 N.E.2d at 641. To comply with section 2-28, the court must determine, at a permanency hearing, the future status of the child and select one of the eight enumerated permanency goals. 705 ILCS 405/2-28(2) (West 2004). Upon selecting a goal, the court must enter a written order setting forth that goal. 705 ILCS 405/2-28(3) (West 2004).

In this case, the trial court originally did not select any of the eight enumerated permanency goals. The first six of the eight goals are as follows:

> "(A) The minor will be returned home
> by a specific date within 5 months.
>
> (B) The minor will be in short-term care
> with a continued goal to return home within
> a period not to exceed one year, where the

- 11 -

progress of the parent or parents is sub-

stantial giving particular consideration to

the age and individual needs of the minor.

(B-1) The minor will be in short-term

care with a continued goal to return home

pending a status hearing ***.

(C) The minor will be in substitute care

pending court determination on termination of

parental rights.

(D) Adoption, provided that parental

rights have been terminated or relinquished.

(E) The guardianship of the minor will

be transferred to an individual or couple

on a permanent basis provided that goals (A)

through (D) have been ruled out."  705 ILCS

405/2-28(2)(A) through (2)(E) (West 2004).

In the current order, the court clearly selected the sixth goal

of private guardianship under section 2-28(2)(E) (705 ILCS 405/2-

28(2)(E) (West 2004)).  After selecting a goal, section 2-28(2)

provides that the court must also indicate in writing the reasons

the goal was selected and why the preceding goals were ruled out.

705 ILCS 405/2-28(2) (West 2004).  If the court selects private

guardianship as a goal, the court must rule out the preceding

five permanency goals (return home within five months, return

home within one year, return home pending a status hearing, substitute care pending termination of parental rights, and adoption) and indicate its reasons for ruling out those five goals. 705 ILCS 405/2-28(2)(E) (West 2004). While the court did not originally follow this procedure, the new order does indicate in writing the reasons the court selected private guardianship and discusses the reasons why it ruled out the preceding goals.

As the trial court has now complied with section 2-28 of the Juvenile Court Act, the issue becomes whether the court's decision regarding the goals it rejected and the goal it selected was against the manifest weight of the evidence. In setting a permanency goal that is in the best interest of the child, the court must consider the following factors:

"(1) Age of the child.

(2) Options available for permanence.

(3) Current placement of the child and the intent of the family regarding adoption.

(4) Emotional, physical, and mental status or condition of the child.

(5) Types of services previously offered and whether or not the services were success- ful and, if not successful, the reasons the services failed.

(6) Availability of services currently

- 13 -

needed and whether the services exist.

> (7) Status of siblings of the minor."

705 ILCS 405/2-28(2)(1) through (2)(7) (West 2004).

The court must also consider the permanency goal recommended by DCFS, the appropriateness of the services provided, the parties' efforts to achieve the goal, and the extent to which the goal has been achieved.  705 ILCS 405/2-28(2) (West 2004).

In S.J. we noted that the trial court originally seemed to rely heavily on only one factor, the child's emotional status. S.J., 364 Ill. App. 3d at 444, 846 N.E.2d at 643.  In the new order, the court reiterates S.J.'s emotional status as a reason for selecting the goal by stating that S.J. "has been in the care of Ms. Faulkner continuously since the beginning of February 2003, when he was a few days old.  Due to the extensive period of time that he has spent in Ms. Faulkner's loving care, and the stability he has received there, [S.J.] has developed a very strong bond with Ms. Faulkner and her children."  While this statement arguably also shows the court considered S.J.'s age and his bond with his foster siblings, the court did not specifically discuss any of the other factors.  We look, therefore, to whether the evidence in the record supports the court's determination.

We agree that the evidence supports ruling out the goal of return home to Roemer.  The court found Roemer unable to care

for, protect, train, and discipline his children. The court specifically found that (1) Roemer's relationship with Kim remained antagonistic; (2) Roemer admittedly and knowingly violated a court visitation order restricting visitation with his three oldest children; (3) Roemer was indicated by DCFS for sexual abuse of his two daughters and stepdaughter; (4) Kim alleged S.J. was conceived when Roemer raped her; and (5) Roemer has continued to refuse to address some of his issues in counseling sessions. The court further noted that Roemer admitted that he had a medical condition that prevented him from caring for his children for more than short periods of time. The court's decision to rule out the goal of return home to Roemer was not against the manifest weight of the evidence.

The real issue is whether the trial court's determination that return home to Kim was not feasible is against the manifest weight of the evidence. As we stated in S.J., the court determined Kim was fit and able to care for three of her five children. S.J., 364 Ill. App. 3d at 444, 846 N.E.2d at 643. Kim's irreparably fractured relationship with her oldest daughter made her unable to care for her oldest child. As for Kim's inability to care for S.J., the court indicated that the primary reason Kim was deemed unable to care for him was that S.J. had lived continuously with Faulkner and recognized Faulkner as his primary caretaker. Upon remand, the court advanced further reservations about Kim, including her antagonistic relationship

with Roemer, credibility issues, her lack of empathy, and her violation of previous court orders. These reservations, though, existed at the time of the first appeal and were apparently not troubling enough to keep three of Kim's children from her.

In S.J., we advanced our reservations about the trial court's decision to rule out return home to Kim based solely on S.J.'s bond with Faulkner. S.J., 364 Ill. App. 3d at 444, 846 N.E.2d at 643. We determined as follows:

"Such reasoning runs counter to the Juvenile Act and to the concept that parents have superior rights to the care and custody of their children. The fact that a child has developed a relationship with his custodian is irrelevant once the goal of return home has been achieved. Even if parental rights have been terminated, the relationship with the custodian must yield to the rights of an adoptive parent, if one can be found. It is desirable that the child have some per- manency in his life, regardless of his relationship with his custodian. For that reason, the goal of transfer of guardianship on a permanent basis is available only 'pro- vided that goals (A) through (D) [variations on return home or adoption] have been ruled

out.'  705 ILCS 405/2-28(2)(E) (West 2004)."

S.J., 364 Ill. App. 3d at 444, 846 N.E.2d at 643.

We remanded, though, to allow the court to state any other reasons S.J. should not be returned home to Kim.  As the new reasons advanced by the trial court did not prevent return home of Kim's three middle children, we fail to see how they can prevent return home of S.J.  Further, these reasons existed before the bonding assessment when the court was going to return S.J. home to Kim.  Only after Dr. Osgood's conclusion that S.J. had developed a bond with Faulkner, did the court conclude return home was no longer a viable option.  Again, it looks as if the sole reason the court determined S.J. should not be returned home is because of his bond with Faulkner.

The "purpose and policy" section of the Juvenile Court Act states that a goal of the Act is to achieve permanency at the "earliest opportunity" for the subject children.  705 ILCS 405/1-2 (West 2004).  Placing S.J. with Kim would achieve permanency as S.J. would be back with his biological family and the court would no longer need to supervise.  Placing S.J. with Faulkner is inconsistent with this goal as the record clearly shows that the court continues to be involved as a referee in the tug-of-war between Faulkner and Kim concerning visitation with S.J.  We do not see how the trial court could rule out a permanent placement with a fit biological parent who is able to parent some of her children in favor of a placement, which will require constant

court supervision, with a foster parent who is not obligated to keep S.J.

It is unfortunate that the delay in this case has resulted in a child being with a foster parent for so many years. When an infant is placed with a foster parent, quick resolution is especially important to prevent situations like these. When a natural parent of a removed infant does not quickly make reasonable efforts and progress, waiting for that parent to turn things around will only create a more difficult situation, especially if that parent eventually achieves fitness. No good resolution is possible when delay in the system results in an infant spending the first several years of his life with a foster parent while the natural parent is given time to improve. It is understandable that, after a period of years, a bonding within a foster family would occur that would make separation difficult, but the goal of the Juvenile Court Act is still to reunify the original family. The Juvenile Court Act attempts to avoid long-term foster placements with the heart-wrenching separations created by return or adoption elsewhere. Johnson v. Burnett, 182 Ill. App. 3d 574, 582, 538 N.E.2d 892, 897-98 (1989).

For the foregoing reasons we find that the trial court's placement of S.J. with Faulkner is against the manifest weight of the evidence as the evidence does not support ruling out the goal of short-term care with a continued goal of return home to Kim within a period not to exceed one year. 705 ILCS 405/2-28(2)(B) (West 2004).

## III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment and remand with directions that the court institute the goal of short-term care with a continued goal of return home to Kim within a period not to exceed one year in compliance with section 2-28(2)(B) of the Juvenile Court Act.

Reversed and remanded with directions.

TURNER, P.J., and McCULLOUGH, J., concur.