NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190602-U

NO. 4-19-0602

FILED
January 21, 2020
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* K.W., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
| Petitioner-Appellee, | ) | No. 13JA16 |
| v. | ) | |
| Justin W., | ) | |
| Respondent-Appellant | ) | |
| v. | ) | Honorable |
| Melissa and Jeremy H., | ) | Jerry J. Hooker, |
| Intervenors). | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Turner and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, concluding (1) respondent failed to persuade section 2-28 of the Juvenile Court Act of 1987 (705 ILCS 405/2-28 (West 2018)) should not be applied as written and (2) the trial court's best-interest finding was not against the manifest weight of the evidence.

¶ 2    Respondent father, Justin W., appeals from the trial court's order denying his petition to restore custody of his child, K.W. (born March 20, 2013). On appeal, respondent argues we should reverse the trial court's order as section 2-28 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-28 (West 2018)) cannot be construed to permit the continued custody of a minor with a third party where the parent is fit, able, and willing to care for the minor.

Alternatively, respondent argues reversal is warranted as the trial court's finding it would not be in K.W.'s best interest to restore custody was against the manifest weight of the evidence. We reject both of respondent's arguments and affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Respondent and Lacinda W. are K.W.'s biological parents. Prior to K.W.'s birth, Lacinda W. had a child with another man. In 2008, Lacinda W.'s parental rights to that child were terminated. Prior to K.W.'s birth, respondent and Lacinda W. had two children together. In 2011, respondent's and Lacinda W.'s parental rights to those children were terminated. All three of K.W.'s biological siblings reside with and/or have been adopted by intervenors, Melissa and Jeremy H.

¶ 5        In March 2013, when K.W. was five days old, the State filed a petition for adjudication of wardship. At the time of filing, K.W. had already been taken into protective custody by the Department of Children and Family Services (DCFS) and placed with Melissa and Jeremy H. In the petition for adjudication of wardship, the State alleged K.W. was neglected "and/or" abused in that his environment was injurious to welfare when residing with respondent and Lacinda W. The State's allegation was based on (1) a December 13, 2012, incident where Lacinda W., who was then six months pregnant with K.W., tested positive for cannabis and phencyclidine; (2) a March 2, 2013, incident where Lacinda W., who was then nine months pregnant, went to an emergency room and denied being pregnant and then left upon staff's refusal to give her medication; (3) respondent's and Lacinda W.'s history of prior indicated reports through DCFS; (4) Lacinda W.'s termination of her parental rights to a child in 2008; and

(5) respondent's and Lacinda W.'s termination of their parental rights to their two children in 2011. The State further alleged it would be in the best interests of K.W. and the public that K.W. be adjudicated a ward of the court. That same month, the trial court entered an order granting temporary custody to DCFS with the power to place. K.W. remained placed with Melissa and Jeremy H.

¶ 6        In October 2013, the trial court entered an adjudicatory order finding K.W. neglected "and/or" abused based on (1) respondent and Lacinda W. having a history of indicated reports and court involvement due to their substance abuse and domestic violence issues, (2) respondent and Lacinda W. having their parental rights to other children terminated, and (3) Lacinda W. having pursued drugs while pregnant with K.W.

¶ 7        In December 2013, the trial court entered a dispositional order adjudicating K.W. a ward of the court. The court found both respondent and Lacinda W. "unfit or unable, for some reason other than financial circumstance alone to care for, protect, train or discipline the minor or are unwilling to do so, and the health, safety and best interest of the minor will be jeopardized if the minor remains in [their] custody." The court granted guardianship and custody to DCFS. DCFS continued K.W.'s placement with Melissa and Jeremy H.

¶ 8        In May 2015, the State filed a motion to terminate respondent's and Lacinda W.'s parental rights. The State alleged both respondent and Lacinda W. were "unfit" parents as defined in the Adoption Act (750 ILCS 50/1(D)(m)(i), 1(D)(m)(ii) (West 2014)) in that they (1) failed to make reasonable efforts to correct the conditions which were the basis for the removal of K.W. from their custody and (2) failed to make reasonable progress towards the return of K.W. to their

custody within the initial nine-month period and subsequent nine-month periods. The State further alleged it would be in K.W.'s best interest to terminate their parental rights.

¶ 9        In October 2015, the trial court found both respondent and Lacinda W. were unfit parents and it would be in K.W.'s best interest to terminate their parental rights. The court entered an order terminating parental rights and granting DCFS the right to consent to adoption. The court set the permanency goal to adoption. Respondent appealed from the court's order terminating his parental rights. Lacinda W. did not appeal and had no further involvement.

¶ 10       In May 2016, we reversed the trial court's order terminating respondent's parental rights and remanded for further proceedings, concluding the State failed to meet its burden to establish respondent was an unfit parent. *In re K.W.*, 2016 IL App (4th) 150897-U. In our order, we highlighted several issues concerning the inconsistencies and insufficiency of the evidence plaguing the State's case. *Id.* ¶ 86.

¶ 11       In July 2016, the trial court entered a permanency order, which changed the permanency goal to return home pending a status hearing. The court also approved of supervised visits between respondent and K.W.

¶ 12       In October 2016, the trial court entered a permanency order, which found respondent had not made substantial progress toward the return-home, pending-status goal. The court continued the goal.

¶ 13       In January 2017, the trial court entered a permanency order, which found respondent had not made substantial progress toward the return-home, pending-status goal. The court continued the goal. The court noted the agency assigned to K.W.'s case, Chaddock, should

- 4 -

exercise it discretion in awarding unsupervised and extended visits between K.W. and respondent.

¶ 14       In April 2017, the trial court entered a permanency order, which found respondent had not made substantial progress toward the return-home, pending-status goal. The court continued the goal.

¶ 15       In July 2017, the trial court entered a permanency order, which changed the permanency goal to return home within five months.

¶ 16       In August 2017, the trial court entered an order directing the State to file a motion to terminate respondent's parental rights "due to findings made by court today regarding this cause." We note the record on appeal does not contain any transcripts relating to this order. The judge who entered the order then recused himself.

¶ 17       In September 2017, a new judge, Honorable Jerry J. Hooker, was assigned to this case.

¶ 18       In October 2017, the State filed a motion to vacate the trial court's order directing it to file a motion to terminate respondent's parental rights and to increase visitation. That same month, the trial court entered an order granting the State's motion. The court found respondent had been compliant with services and visitation should be increased to include overnights.

¶ 19       In November 2017, Melissa and Jeremy H. filed a petition to intervene. The filing of the petition followed an incident where K.W. returned from an unsupervised visit with a mark on his face and, according Melissa and Jeremy H., reported respondent had hit him. An investigation into the incident commenced and visitation was changed from unsupervised to supervised. We note the investigation was later determined to be unfounded and visitation returned

to unsupervised.

¶ 20    In December 2017, Melissa and Jeremy H. filed a petition to terminate respondent's parental rights and a motion to appoint an expert to evaluate K.W. That same month, respondent filed a motion to strike and dismiss Melissa and Jeremy H.'s petition to terminate his parental rights, and DCFS filed an objection to Melissa and Jeremy H. intervening.

¶ 21    In January 2018, the trial court entered appearance and permanency orders. The appearance order found Melissa and Jeremy H. had the right to be heard but not to intervene and struck their prior pleading and motion. The permanency order set the permanency goal to return home within five months.

¶ 22    In March, April, and July 2018, the trial court entered permanency orders, all of which continued the return-home goal.

¶ 23    In September 2018, respondent filed a motion to restore custody. In his motion, respondent asserted he had corrected the conditions that were the basis for the removal and made substantial and sufficient progress in all areas of concern to the degree that he should be deemed a fit parent. Respondent argued, because he was fit, "the only alternative under the Juvenile Court Act is to return [K.W.] to his [custody]." Respondent further argued it would be in K.W.'s best interest to restore custody. In support of his arguments, respondent cited *In re M.M.*, 2016 IL 119932, 72 N.E.3d 260, and *In re S.J.*, 368 Ill. App. 3d 749, 859 N.E.2d 281 (2006). That same month, the trial court entered an appearance order allowing Melissa and Jeremy H. to intervene.

¶ 24    In November 2018, the trial court entered an order directing DCFS to arrange a psychological evaluation of K.W. "to determine the impact of removal from the foster home, the

services necessary for this transition[,] [and] the time frame for it."

¶ 25        In April and May 2019, the trial court entered permanency orders, both of which continued the return-home goal. The orders noted the court required additional information concerning the effect of removing K.W. from his foster home and placing him with respondent.

¶ 26        In August 2019, the trial court conducted a three-day hearing on respondent's motion to restore custody and permanency. Respondent and Melissa and Jeremy H. presented evidence. The court heard testimony from a caseworker who was also qualified as an expert in child welfare, visitation specialists, therapists, a court appointed special advocate, a kindergarten teacher, a special education coordinator, a school principal, a qualified expert in child psychology and neuropsychology, and Melissa H. The court also received several exhibits and took judicial notice over no objection of various orders, service plans, and reports in the trial record. The following is gleaned from the evidence presented.

¶ 27        Following our reversal of the trial court's order terminating respondent's parental rights, respondent pursued recommended services and goals.

¶ 28        Respondent maintained adequate housing and employment. Respondent had resided at the same address for two years. He lived with his mother, who assisted with paying rent. Respondent had worked at the same place for over two years. He would be able to provide for K.W.'s financial needs with employment income, government assistance, and financial assistance from his mother. If respondent's mother was no longer able to provide financial support, respondent would not have sufficient funds to maintain his current residence.

¶ 29        Respondent attended to his mental health and was no longer involved with K.W.'s

mother. Respondent took medication and attended therapy to deal with his depression. He would need to continue with therapy even if K.W. was returned to his care. Respondent was no longer in a relationship with K.W.'s mother and had not been around her. However, he was still married to her due to the cost of seeking a divorce.

¶ 30        Respondent attended visitations. There were no concerns with respondent's interactions and parenting abilities during visitations. The visitation specialists testified K.W. never expressed any concern or hesitation with visitations. K.W.'s 2018-19 kindergarten teacher and principal testified K.W. would act out and become emotional on days he had to visit with respondent. K.W.'s kindergarten teacher specifically testified on the days K.W. was called to the office to be transported to visitation "a look of death came over his face" and K.W. would state he did not want to go. K.W.'s teacher also testified K.W. had reported respondent was "mean" and "hits me" and did not provide food or toys during visits. K.W.'s principal recalled K.W. crying while waiting to be transported for visitation. Visitations ultimately transitioned to unsupervised overnight visits Monday through Friday during the summer of 2019. During that time, respondent kept K.W. on a routine, enrolled him in a YMCA summer program, and did various activities with him, such as bowling and playing outside. Respondent also attended and actively participated in weekly therapy with K.W., who had been diagnosed with adjustment disorder with anxiety. Respondent and K.W. had been attending therapy together since January 2019.

¶ 31        Through respondent's pursuit of recommended services and goals, a bond developed between K.W. and respondent. K.W. referred to respondent as "Dad."

¶ 32        K.W., who at the time of the hearing was about six-and-a-half years old, had been

placed with Melissa and Jeremy H. since shortly after his birth. K.W.'s foster siblings included one half sibling and two full siblings. K.W. was bonded to his foster parents and siblings. He referred to Melissa and Jeremy H. as "Mom" and "Dad." The foster family had extended family who supported K.W. Melissa H. worked with K.W.'s school to implement an individualized education plan for K.W. during the spring of 2019.

¶ 33　　　　At various points during the six-and-a-half years of placement, issues arose with K.W.'s foster family. The foster family had displayed inappropriate behavior in front of K.W. prior to and after visits with respondent. The foster parents worked to change their behavior after the issue was brought to their attention by K.W.'s therapist. The foster family also had referred to respondent as "that man." Melissa H. testified the family referred to respondent as "that man" after K.W. had done so but no one had made such a reference in years. At one point, K.W.'s doctor expressed concern with K.W.'s weight gain. In December 2017, Melissa and Jeremy H. rated unsatisfactory on a service plan as K.W.'s therapist reported they failed to follow advice and recommendations and the home was chaotic at times with minimal structure. Sometime in 2018, K.W.'s caseworker spoke with Jeremy H. about using K.W.'s foster siblings as a resource if K.W. was returned to respondent's care, which caused Jeremy H. to state respondent was crazy if he thought he was going to be able to see the other children. In June 2019, Melissa and Jeremy H. rated unsatisfactory on a service plan as K.W. had not had his six-year wellness check and they did not support the return-home goal.

¶ 34　　　　Melissa H. testified she would work to foster the relationship between respondent and K.W. even if K.W. remained in her home. She acknowledged she was previously resistant to

K.W. having a relationship with respondent but asserted she had such resistance because K.W. would be upset about visitations and had expressed he did not want to go.

¶ 35 K.W.'s caseworker, who was qualified as an expert in child welfare, opined K.W. was well-integrated into the foster home and would require therapy for any transition therefrom. She further opined K.W. could be returned to respondent's care without jeopardizing his health, safety, and welfare and it would be in his best interest. In the event K.W. was returned to respondent's custody, K.W.'s caseworker recommended continued services for respondent and K.W. for at least six months.

¶ 36 Dr. Jessica Patel, the qualified expert in child psychology and neuropsychology, rendered an opinion about the removal of K.W. from the foster home. Dr. Patel testified she conducted an evaluation where she performed a number of tests, interviewed K.W., and reviewed certain records. Dr. Patel testified the tests she performed ultimately had minimal relevance to the opinion she reached; rather, her opinion was based on her clinical experience and training and her review of what had transpired since K.W.'s birth.

¶ 37 Dr. Patel opined K.W.'s removal from the foster home would cause a substantial trauma and irreparable harm. She testified removal would be "basically the equivalent of like a death *** that's going to change [K.W.'s] whole life trajectory." The trauma would be "virtually the same as it would be for any six[-]year[-]old who would then be removed from the only family they have ever known." Dr Patel testified "[i]t would be the equivalent if any of us went home and our whole family was gone and even if we went to go live with someone else, who we might really like or have a good relationship with, that's still going to be a very negative impact."

¶ 38        Dr. Patel testified the long-term impact from the trauma of removing K.W. from the foster home could include anxiety, depression, and learning difficulties. When asked if there were any therapies or services to mitigate or rectify the trauma, Dr. Patel testified,

> "As I wrote in my report, I don't think so, no. Here is the issue is we do have therapy that can help with trauma, but as adults it's our job to protect kids from trauma and not to cause a trauma and then try to rectify it later, which is basically what we would be doing. It's causing something to happen, and then saying, okay, let's provide therapy to try to make it better instead of just making it not happen to begin with."

Dr. Patel further testified she did not believe any six-year-old, let alone most adults, would be able to cope with the kind of trauma in terms of a full removal from a family he or she had known since birth.

¶ 39        Dr. Patel acknowledged she did not evaluate the bonding or attachment between K.W. and his foster family or K.W. and respondent. Dr. Patel did not believe such evaluations would be relevant to her opinion. Dr. Patel testified her opinion would not change even if respondent previously had frequent visitation and encouraged a relationship between K.W. and his foster family "[b]ecause it is still his every single day who he resides with and who he is around in terms of his family, in terms of his siblings."

¶ 40        Dr. Patel also acknowledged she used unequivocal terms in her written report about the trauma of removing K.W. from the foster home. She asserted she did so because "that's how

strongly I feel based on my expert opinion in this case." Ultimately, Dr. Patel testified,

> "[I]f I had an ideal world, then if [K.W.] could continue to reside in the home that he has been in with his siblings and then have an ongoing relationship with his biological father, who would be very involved with the family as much as possible, that would be great because he would be able to have that stability that he has had with his family and siblings and kind of keep that family intact, but he would still have a relationship with someone who, you know, obviously, the [c]ourt feels is able to handle him."

¶ 41 Based on the evidence presented, respondent, joined by the State, DCFS, and the guardian *ad litem*, recommended custody be restored and the permanency goal be changed to remain home. Specifically, respondent argued he was fit, willing, and able to care for K.W. and, therefore, custody should be restored in accordance with *M.M.* Respondent also argued it would be in K.W.'s best interest to restore custody. In so arguing, respondent suggested Dr. Patel's opinion, like the expert's opinion in *S.J.*, could not support a finding to the contrary. Conversely, Melissa and Jeremy H. recommended custody to not be restored and the permanency goal be changed to guardianship. Specifically, they argued respondent was not a fit parent but, even if he was a fit parent, it would not be in K.W.'s best interest to restore custody. In so arguing, Melissa and Jeremy H. asserted (1) *M.M.* was not controlling as the respondent in that case had not been declared unfit and (2) *S.J.*, or at least its earlier companion case *In re S.J.*, 364 Ill App. 3d 432, 846 N.E.2d 633 (2006), was overruled by *M.M.*

¶ 42　　　　In the oral pronouncement of its decision, the trial court considered respondent's fitness. The court found respondent "completed I think for the most part everything he was required to do." At one point, the court stated:

> "To terminate his parental rights, I would have to find [respondent] unfit, and I can't make that finding. If it occurred in the first two years, and that's been reversed, then at this point I can't find him unfit."

At another point, the court, after noting visitation went well over the summer, stated, "[s]o I cannot find [respondent] unfit and terminate his parental rights."

¶ 43　　　　The trial court also considered K.W.'s best interest. The judge noted in his 30 years of experience with the juvenile system "I have never seen a case with this set of specific facts." The court found K.W. was placed with his foster family, which included biological siblings, shortly after his birth and then remained placed with that family for nearly six-and-a-half years. The court found K.W. was bonded to his foster family. The court accepted Dr. Patel's opinion that removal from the foster family would result in a significant trauma and irreparable harm. The court found K.W. had spent close to two years getting to know respondent, during which time a bond developed. Based on the evidence before it, the court concluded it would not be in K.W.'s best interest to grant respondent's motion to restore custody. The court denied respondent's motion and set the permanency goal to private guardianship.

¶ 44　　　　After reaching its decision, the trial court admonished Melissa and Jeremy H. that, in the event a petition for guardianship is granted, respondent could later petition for the

guardianship to be modified or terminated. The court further encouraged respondent and Melissa and Jeremy H. to work together to serve K.W.'s best interest.

¶ 45        The trial court entered a written order. In the form permanency order, the court, in part, changed the goal to private guardianship and then indicated the goal was selected and the other goals were ruled out "based on reports/evidence presented over the course of these proceedings. Dr. Patel['s] expert testimony that removing minor from [f]oster [f]amily would cause irreparable harm to the minor (depression, trauma, anxiety) [and] no am[oun]t of couns[eling] [and] service would stop the harm so not in child's best interest." The court also crossed off language indicating "[t]he parents remain unfit, unable or unwilling to care for, protect, train and discipline the minor" and then wrote "[c]ourt finds that father is not unfit." At the end of the order, the court wrote respondent's motion to restore custody was denied and directed Melissa and Jeremy H. "to file [a] petition for guardianship (if that is their intent) within 45 days."

¶ 46        Following the entry of the trial court's order, respondent filed with this court a petition for leave to appeal under Illinois Supreme Court Rule 306(a)(5) (eff. Nov. 1, 2017). Over no objection, we granted respondent's petition.

¶ 47        This appeal followed.

¶ 48                                II. ANALYSIS

¶ 49        On appeal, respondent argues we should reverse the trial court's order as section 2-28 of the Juvenile Court Act (705 ILCS 405/2-28 (West 2018)) cannot be construed to permit the continued custody of a minor with a third party where the parent is fit, able, and willing to care for the minor. Alternatively, respondent argues reversal is warranted as the trial court's finding it

would not be in K.W.'s best interest to restore parental custody was against the manifest weight of the evidence. The State agrees with respondent's second argument but does not address his first. Melissa and Jeremy H. have not presented argument.

¶ 50                                    A. Section 2-28 of the Juvenile Court Act

¶ 51        Respondent argues we should reverse the trial court's order as section 2-28 of the Juvenile Court Act (*id.*) cannot be construed to permit the continued custody of a minor with a third party where the parent is fit, able, and willing to care for the minor.

¶ 52        At the outset, we note respondent's argument is premised on the trial court having found him to be fit, able, and willing to care for K.W. Respondent contends, citing the proposition from *In re C.H.*, 2017 IL App (3d) 160729, ¶ 11, 97 N.E.3d 540, that a "parent is either fit or unfit," the trial court's finding he was "not unfit" was, in effect, a finding he was fit, and the court did not otherwise find him to be unable or unwilling to care for K.W. The State agrees, going further by asserting "the trial court specifically found that respondent was fit." While the court should have made its finding explicit and specific, we agree the record sufficiently demonstrates the court found respondent to be fit, able, and willing to care for K.W.

¶ 53        Section 2-28 of the Juvenile Court Act (705 ILCS 405/2-28 (West 2018)) provides a process by which a parent who has lost custody of a neglected or abused child may move for a trial court to restore custody. Section 2-28(4) states, in relevant part, as follows:

> "Custody of the minor shall not be restored to any parent ***
>
> in any case in which the minor is found to be neglected or abused
>
> ***, unless the minor can be cared for at home without endangering

his or her health or safety and it is in the best interest of the minor, and if such neglect [or] abuse *** is found by the court under paragraph (1) of Section 2-21 of this Act to have come about due to the acts or omissions or both of such parent ***, until such time as *** a hearing is held on the issue of the health, safety and best interest of the minor and the fitness of such parent *** to care for the minor and the court enters an order that such parent *** is fit to care for the minor." *Id.* § 2-28(4).

¶ 54 Respondent does not dispute the plain language of section 2-28(4) prohibits a court from restoring custody of a neglected or abused minor to the minor's parent unless the court finds (1) the parent is fit to care for the minor *and* (2) restoring custody would be in the minor's best interest. Respondent argues, however, it would be repugnant to the purpose and policy of the Juvenile Court Act and the United States Constitution to hold a fit parent's right to the custody of his or her child must yield to the child's best interest when deciding a motion to restore custody. In support of his argument, respondent, as he did before the trial court, relies heavily upon *M.M.* and the supreme court's observations therein.

¶ 55 In *M.M.*, 2016 IL 119932, ¶ 10, the trial court, at the close of a dispositional hearing, granted custody of the respondent mother's neglected children to a third party, DCFS, despite finding the respondent-mother fit. The respondent mother appealed, and the appellate court reversed, finding the trial court was not authorized under section 2-27(1) of the Juvenile Court Act (705 ILCS 405/2-27(1) (West 2012)) to grant custody of the minors to DCFS without a finding of

unfitness or a properly supported finding the respondent was unable or unwilling to care for the minors. *Id.* ¶¶ 11-12. The State filed a petition for leave to appeal, which the supreme court granted. *Id.* ¶ 13.

¶ 56        Before the supreme court, the State argued the appellate court erred by holding a trial court must find parental unfitness, inability, or unwillingness before granting a third-party custody of a neglected, abused, or dependent minor. *Id.* ¶ 15. The State asserted a trial court is authorized to grant custody of a neglected, abused, or dependent minor to a third-party if it would be in the minor's best interest. *Id.*

¶ 57        The supreme court, turning first to the plain language of the statute, found section 2-27(1) explicitly provided a trial court must, prior to committing a minor the custody of a third-party, determine whether the parent is unfit, unable, or unwilling to care for the minor, *and* whether the best interest of the minor will be jeopardized if custody remains with the parents. *Id.* ¶ 21. The court found to adopt the State's interpretation of section 2-27(1) it would need to construe "and" to mean "or," which it could only do if there was an "apparent repugnance or inconsistency in [the] statute that would defeat its main intent and purpose." *Id.*

¶ 58        The supreme court observed a purpose of the Juvenile Court Act is "to preserve and strengthen the minor's family ties whenever possible, removing him or her from the custody of his or her parents only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal." (Internal quotation marks omitted.) *Id.* ¶ 23. The court also observed: "It is apparent that the preferred result under the Juvenile Court Act is that a child remain in his or her home, in the custody of his or her parents. This is a clarification of the child's

best interests." (Internal quotation marks omitted.) *Id.* The court found the statutory scheme for dispositional hearings effectuated the purpose and policy of the Juvenile Court Act, noting "that even where the best interest standard permeates and governs the entire dispositional hearing, placement of the minor with a third party nonetheless requires the prerequisite consideration of parental fitness." *Id.* ¶ 24.

¶ 59 The supreme court also considered the constitutionality of the statute. *Id.* ¶¶ 26-28. The court observed parents have a fundamental liberty interest in the care, custody, and control of their children. *Id.* ¶ 26. The court further observed, "as a matter of constitutional law, there is a presumption that fit parents act in the best interests of their children" and, so long as a parent is fit, "there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." (Internal quotation marks omitted.) *Id.* The court found the State's interpretation that the best interest standard trumps all would run afoul of a parent's constitutional rights. *Id.* ¶ 27. In so finding, the court repudiated the "repeated pronouncement that, in child custody disputes, it is not necessary that the natural parent is unfit or has forfeited his or her custodial rights before awarding custody to another person if the best interests of the child will be served." *Id.* ¶ 28. The court determined applying the statute as written respects the constitutional rights of parents while also insuring to protect the best interests of children. *Id.* ¶ 27.

¶ 60 After its review, the supreme court concluded the statute must be applied as written and held "section 2-27(1) of the [Juvenile Court] Act does not authorize placing a ward of the court with a third party absent a finding of parental unfitness, inability, or unwillingness to care for the

minor." *Id.* ¶ 31.

¶ 61        Respondent contends the supreme court's observations concerning the purpose and policy of the Juvenile Court Act and the constitutional requirements relating to granting custody of a neglected or abused minor to a third party apply with equal force to our review of the requirements to restore custody under section 2-28(4). We disagree. The supreme court's observations related to the initial stage where the State was seeking to inject itself to remove custody from a fit parent and place it with a third party. On a motion to restore custody under section 2-28(4), the State has already injected itself, the parent has been found unfit, unwilling, or unable to care for the neglected or abused minor, and custody has been removed from the unfit, unable, or unwilling parent. Respondent has failed to persuade that prohibiting a court from restoring custody of a neglected or abused minor to the minor's parent unless the court finds the parent is fit to care for the minor *and* restoring custody would be in the minor's best interest is repugnant to the purpose and policy of the Juvenile Court Act or the United States Constitution. Accordingly, we must apply section 2-28(4) as written.

¶ 62                           B. Best-Interest Finding

¶ 63        Respondent alternatively argues we should reverse the trial court's order as its best-interest finding was against the manifest weight of the evidence.

¶ 64        In support of his argument, respondent, as he did before the trial court, relies heavily upon *S.J.* In that case, the respondent-parents appealed from a permanency order finding it would be in their neglected child's best interest for custody and guardianship to be transferred to the child's foster mother. *S.J.*, 368 Ill. App. 3d at 749. On appeal, this court, in part, considered

whether the trial court's determination to rule out a return home to the respondent mother was against the manifest weight of the evidence. *Id.* at 756-58. After reviewing the record, we concluded it appeared as if "the sole reason the court determined [the minor] should not be returned home is because of his bond with [his foster mother]." *Id.* at 758. Given that was the only reason to rule out returning the minor to a fit biological parent, we concluded the court's decision was against the manifest weight of the evidence. *Id.* at 758-59.

¶ 65      Unlike *S.J.*, the trial court considered more than just the bond between K.W. and his foster parents in reaching its finding that it would not be in K.W.'s best interest to restore custody. The court indicated it also considered the fact K.W. was placed with his foster family shortly after his birth, the fact K.W. had resided with foster family for six-and-a-half years, and the fact K.W. lived with and was bonded to biological siblings. The court also adopted Dr. Patel's opinion that removing K.W. from his foster family after six-and-a-half years would cause significant trauma and irreparable harm. Based on the evidence presented, we cannot say the court's finding it would not be in K.W.'s best interest to restore custody was against the manifest weight of the evidence. See *In re Parentage of J.W.*, 2013 IL 114817, ¶ 55, 990 N.E.2d 698 (a finding is against the manifest weight of the evidence "only when the opposite conclusion is clearly apparent").

¶ 66      As the trial court recognized, the circumstances of this case are unique. While the delays resulting in K.W. remaining in foster care for so many years may be attributable to all interested parties, the responsibility for K.W. first being taken into care lies with respondent. To his credit, respondent actively pursued services to correct the conditions that forced K.W. into

- 20 -

care. Throughout, Melissa and Jeremy H. have continued to provide for K.W.'s welfare. While it is clear issues arose during the six-and-a-half years of placement, there is nothing in the record to suggest the issues presented caused sufficient concern by DCFS or any interested party to seek a change in placement. Ultimately, K.W.'s involvement in the juvenile court system has resulted in three parental figures who have been involved in his life and care for him deeply. As the trial court stressed, respondent and Melissa and Jeremy H. should work together to serve K.W.'s best interest.

¶ 67                                        III. CONCLUSION

¶ 68            We affirm the trial court's judgment.

¶ 69            Affirmed.