NOTICE
Decision filed 07/19/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 230162-U

NO. 5-23-0162

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* A.R., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Coles County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-JA-31 |
| | ) | |
| Breanna H., | ) | Honorable |
| | ) | Jonathan T. Braden, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Justices Moore and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held:* Where the trial court's orders finding that Breanna H. was an unfit parent and that the best interest of the minor child warranted termination of her parental rights were not contrary to the manifest weight of the evidence, we affirm the orders.

¶ 2    Breanna H. (Breanna) is the mother of a boy, A.R., who had been exposed during gestation to methamphetamine. Due to these concerns, the Department of Children and Family Services (DCFS) took protective custody of A.R. four days after he was born. Due to Breanna's failure to make reasonable efforts and progress towards the return of A.R. to her care, the State filed its motion to terminate her parental rights. After the trial court found that Breanna was an unfit parent, the court concluded that it was in A.R.'s best interest to terminate her parental rights. She appeals from these orders.

1

¶ 3                                    I. BACKGROUND

¶ 4     A.R. was born on May 21, 2021. His mother is Breanna, and his father is Allen R.[1] At the hospital, Breanna informed a nurse of her previous history of drug usage, including marijuana, amphetamines, and benzodiazepines. As a result of that admission, a drug screen was conducted by the hospital upon A.R.'s delivery. The results revealed that Breanna had both methamphetamine and amphetamines in her system. The hospital initiated a hotline call to DCFS. While still in the hospital, Breanna informed the on-call DCFS worker, and later the follow-up DCFS worker, that shortly before she came to the hospital, she drank a glass of Kool Aid that had been contaminated with bong water. She stated that the bong may have been used to smoke methamphetamine. Breanna also acknowledged that persons in her apartment were smoking methamphetamine in her presence.

¶ 5     A DCFS worker asked Breanna about her history of drug usage. Breanna stated that she began using drugs with her parents when she was 14. She began using methamphetamine when she was 18. Breanna acknowledged that she had used methamphetamine for two years before A.R.'s pregnancy. When she became pregnant with A.R., Breanna continued to use methamphetamine for the first month of the pregnancy. She also admitted that about three months later, she relapsed, and she began using methamphetamine again. Allen R. confirmed Breanna's usage of methamphetamine before and during A.R.'s pregnancy.

¶ 6     On May 23, 2021, DCFS took A.R. into protective custody for several reasons. First, Breanna had a substantial substance abuse history. She also had prior mental health hospitalizations for overdoses or suicide attempts by prescription medication. Breanna had been

_____

[1]On February 3, 2023, Allen appeared in court and formally surrendered his parental rights to A.R. and is not a party to this appeal.

diagnosed with depression and borderline personality disorder but discontinued the prescription medication two years earlier. In addition, Breanna was not currently engaged in mental health and/or substance abuse treatment. DCFS placed A.R. with a family member—Allen's aunt.

¶ 7 On May 25, 2021, the State filed a petition for adjudication of wardship. The petition alleged that A.R. was neglected in that he was not receiving proper or necessary support or other remedial care necessary for his well-being (705 ILCS 405/2-3(1)(a) (West 2020)) and was in an environment that was injurious to his welfare because his mother abused illegal drugs during her pregnancy (*id.* § 2-3(1)(b)).

¶ 8 At the May 25, 2021, shelter care hearing, Breanna testified that she had scheduled her own appointments for mental health and substance abuse treatment. The trial court entered a temporary custody order finding that probable cause existed to find that A.R. was neglected because Breanna tested positive for amphetamines and methamphetamine immediately after A.R.'s birth and that an immediate and urgent necessity existed to support A.R.'s removal from her care. The court further found that reasonable efforts could not prevent or eliminate the necessity for A.R.'s removal because "substance abuse cannot be quickly remedied," and Breanna had admitted to illegal drug use during her pregnancy. The court granted temporary custody of A.R. to DCFS.

¶ 9 The trial court held the adjudicatory hearing on July 2, 2021. Breanna was not present and was reported to be in a local residential substance abuse program. The State presented its factual basis, which included Breanna's hospital interview with DCFS and her admissions of methamphetamine use during portions of A.R.'s pregnancy. The court entered its adjudicatory order finding that A.R. was neglected.

3

¶ 10    On August 6, 2021, DCFS filed its dispositional report. DCFS reported that Breanna was unemployed. DCFS recommended that Breanna obtain mental health and substance abuse assessments and complete parenting classes. Breanna agreed to cooperate with DCFS, submit to random drug screens, participate in visitation with A.R., and maintain contact with DCFS. DCFS reported that Breanna was attending an average of two of three weekly supervised visits with A.R.

¶ 11    On August 20, 2021, the trial court held a dispositional hearing. An attorney representing Allen advised the court that both Breanna and Allen were having "significant problems with getting services" through DCFS. The trial court reminded the parents that they were obligated to cooperate with DCFS. The court encouraged the parents to do everything within their control to expeditiously move this case forward despite the difficulties in getting services set up. The court made A.R. a ward of the court and awarded custody and guardianship to DCFS.

¶ 12    CASA of East Central Illinois, who was serving as an advocate for A.R., filed its report with the court before the January 14, 2022, permanency hearing. CASA reported that Breanna and Allen were separated, that Breanna had claimed the couple had an altercation, and that on December 20, 2021, she had checked herself into Hope House, a local domestic violence shelter. However, CASA noted that the couple had been seen together out in public after Breanna left Hope House. CASA also noted that DCFS, through the provider One Hope United, was providing services. CASA expressed its concern that One Hope United was not requiring Breanna to submit to regular drug tests. CASA reported that A.R.'s foster parent contacted the One Hope United caseworker on December 20, 2021, with concerns that Breanna was under the influence during her visit with A.R. However, the caseworker had not contacted the foster parent about her concern. CASA reported that Breanna had attended only four visits with A.R. Since November 25, 2021.

¶ 13    On January 14, 2022, the court held a permanency hearing. Breanna contested the December 10, 2021, permanency report filed by DCFS. She took issue with DCFS's finding that she was not making reasonable efforts or progress toward reunification. The report indicated that Breanna needed to complete a mental health evaluation and needed to be consistent with supervised visitation. Breanna had completed parenting classes and a substance abuse evaluation and was engaged in group and individual substance abuse counseling. DCFS reported that Breanna's last drug test was negative, but she needed to submit to a weekly test.

¶ 14    The State called one witness at the January 14, 2022, contested permanency hearing. Jacinda Wilson testified that she was the caseworker assigned to this case and was employed by One Hope United. Wilson testified that she had provided paperwork with the drug-testing order to Breanna and scheduled a drug test for her at an area hospital's clinic. Breanna failed to take the paperwork to the clinic as instructed by Wilson, and the clinic refused to do the drug test. Wilson testified that Breanna tested positive for methamphetamine within one week of this hearing. That test was conducted by Breanna's probation officer. Breanna had been proactively attending supervised visits with A.R. Breanna informed Wilson that she was separated from Allen.

¶ 15    At the conclusion of the hearing, the trial court found that the appropriate permanency goal was to return A.R. home within 12 months. Breanna had not completed her required service plan tasks. The court found that she had not made reasonable and substantial progress or efforts toward reunification. The court maintained guardianship and custody of A.R. with DCFS.

¶ 16    DCFS filed its next permanency report on April 27, 2022. Breanna was reported as being inconsistent with her visits with A.R. She had a positive drug screen on March 3, 2022, for marijuana. The results of an April 21, 2022, drug test were not available as of the date the report was prepared. Breanna had been discharged from substance abuse treatment in February 2022 due

5

to a failure to engage. DCFS recommended that the permanency goal remain to return A.R. home within 12 months. However, DCFS noted that the case was being referred to legal screening to determine whether the goal should be changed to substitute care pending termination of parental rights. The permanency hearing was held on April 29, 2022. Breanna agreed with DCFS's recommended permanency goal and agreed that she had not made reasonable efforts or progress.

¶ 17    DCFS filed a permanency report with the trial court on July 19, 2022. As of the date of the report, Breanna was in the process of being evicted from her apartment and was unemployed. Her plan was to move in with her mother. Breanna participated in her visitation opportunities with A.R. and had successfully completed parenting classes. However, DCFS determined that Breanna would benefit from additional parenting classes and was going to make this referral. At the end of May 2022, Breanna was again dropped from substance abuse treatment due to her failure to engage. Breanna was cooperative with her drug screens and had consistently tested negative. However, on July 13, 2022, during a meeting with her caseworker, Breanna was transported to the area hospital for a direct-observed random drug test. On this test, Breanna tested positive for methamphetamine and marijuana. She then confessed that she had been using someone else's urine for the recent negative drug tests conducted at Help at Home. Breanna also confessed that she had relapsed. DCFS stated that because the foundation for this case was substance abuse, it would provide transportation for Breanna to the local hospital for all future drug tests. DCFS added two additional tasks to Breanna's service plan—obtaining a legal source of income and obtaining adequate housing. DCFS recommended that the trial court find that Breanna had not made reasonable and substantial efforts or progress during this reporting period.

¶ 18    On July 22, 2022, the trial court held its next permanency hearing. Breanna stipulated to the recommendations made by DCFS. The trial court entered its order finding that the appropriate

6

goal for A.R. was to return home within 12 months. Custody and guardianship of A.R. remained with DCFS.

¶ 19    DCFS filed its next permanency report on October 20, 2022. Breanna reported that she was employed full time at a local gas station and a convenience store. She had filed for divorce from Allen and was in a new relationship, stating that her paramour was "a good influence." DCFS determined that this paramour was currently in jail on charges of methamphetamine possession. Breanna was successfully discharged from inpatient substance abuse treatment on August 27, 2022. She was currently engaged in outpatient treatment. Breanna's last negative drug screen was on September 15, 2022. On October 11, 2022, Breanna walked out of the hospital after being taken there for a drug screen, stating that she would "just take the fail." Then on October 19, 2022, Breanna was sent for another observed drug test at the hospital, and she failed to show. DCFS indicated that it was working on the legal screening in this case, and asked the court to find that Breanna was not making reasonable progress or efforts on her service plan, and to set the case for another hearing in one month.

¶ 20    The trial court held the next permanency hearing on October 21, 2022. Breanna disagreed with DCFS's report that she had not made reasonable efforts or progress on her service plan and requested a hearing, which the court set for December 16, 2022.

¶ 21    On December 15, 2022, DCFS filed an addendum to its October 2022 permanency report. Breanna had not been in consistent contact with DCFS since the October 2022 report and had failed to appear for seven drug tests from October through early December 2022. DCFS reduced Breanna's visitation time with A.R. from two hours to one hour until she passed three consecutive drug tests. DCFS reported that Breanna was then unemployed and homeless. DCFS conducted its

7

legal screening on December 15, 2022, and recommended changing the goal to substitute care pending termination of parental rights.

¶ 22    On January 27, 2023, the State filed its motion seeking to terminate Breanna's parental rights. The State alleged that Breanna had failed to make reasonable progress toward the return of A.R. within any nine-month period following A.R.'s adjudication, specifically between March 1, 2022, and December 1, 2022 (750 ILCS 50/1(D)(m)(ii) (West 2020)).

¶ 23    The trial court held the fitness hearing on March 10, 2023. The State called one witness and Breanna testified on her own behalf. Jasmine Roa, a case manager with One Hope United, testified that she had been assigned to work with Breanna and A.R. since March 25, 2022. Noting that A.R. had been in DCFS care since May 2021, upon being assigned to the case, Jasmine reviewed all the records and spoke with Breanna. Roa testified that Breanna was a very pleasant person but that her compliance with the service plan objectives had been inconsistent. Moreover, Roa testified that Breanna did not respond to her text messages or show up for scheduled meetings. Upon Breanna's separation from Allen in approximately July 2022, Breanna became more cooperative and went into inpatient substance abuse treatment that same month. However, by September 2022, Breanna had again become noncommunicative. Roa testified that she confirmed Breanna had the same phone number.

¶ 24    Roa testified that on multiple occasions, she had reviewed the service plan objectives with Breanna, and stated that Breanna "displayed a full understanding" of the services required. In November 2022, Breanna completed a mental health assessment, but she was closed out of services for failing to attend two subsequent appointments. Roa described Breanna's compliance with substance abuse treatment as inconsistent, and testified that since March 2022, Breanna had been dropped from outpatient treatment at the Hour House five times due to lack of cooperation. Roa

8

acknowledged that Breanna completed a 30-day inpatient treatment stay, but that she failed to follow the recommendation to move into a structured sober-living facility upon discharge. Breanna told Roa that she would prefer to engage in outpatient substance abuse supportive therapy. Breanna did not have stable housing and was reportedly staying with different friends. Roa testified that Breanna asked her to conduct a home and safety checklist on one of these places. However, Roa stated that because a resident overdosed in that home one week before Breanna's request, it was decided that this environment would not be appropriate for A.R. Roa also confirmed that Breanna had been briefly employed at a gas station and convenience store in October 2022, but that she had otherwise been unemployed. Breanna was also required to submit to random drug tests. Roa testified that since March 2022, Breanna had missed 12 drug tests. For each scheduled test, Roa reached out to Breanna about providing her transportation to the hospital. She stated that when a parent of a child in care misses drug screens, DCFS has concerns that the parent is using illegal substances. At one visit with A.R. in January 2023, the family support specialist believed that Breanna was under the influence and asked her to take a drug test, but Breanna refused. Roa also testified about Breanna's visits with A.R. She indicated that Breanna had missed 10 visits since March 2022, and never complied with the required three negative drug tests to have two hours of visitation reinstated.

¶ 25    Roa testified that Breanna had completed parenting classes before she became involved in the case in March 2022. She also had completed mental health services. Roa last spoke to Breanna in January 2023. Roa received confirmation that Breanna had recently resumed substance abuse treatment. In addition, Roa learned that Breanna was now employed at a Dollar General store. Roa testified that she was uncertain where Breanna was currently living, and that she had attempted to

reach out to her on multiple occasions without any reply. However, she testified that Breanna had always shown interest in A.R., and that she had potential to be a good parent.

¶ 26 Breanna testified that she was living in an apartment but that it needed to be "fixed up" by the landlord. She estimated that it would take six months before the apartment was ready. Breanna stated that she had been employed by Dollar General for the past month. She testified that she had one or two sessions with the mental health therapist provided through One Hope United, but switched to a therapist at LifeLinks because her borderline personality disorder diagnosis required a specific type of therapy that the One Hope United therapist could not provide. Breanna had also begun prescription medication for her mental health issues. She testified that upon discharge from inpatient substance abuse treatment, she declined the recommended transition to a sober-living house because she had heard that residents of this program had overdosed. She testified that she believed that her sober friends would provide a better environment for her.

¶ 27 At the conclusion of the fitness hearing, the court found that there was overwhelming evidence that Breanna had made no progress: "We are no closer today to returning A[.R.] to you than when we started this case, and, in fact, as it relates to your visitation, we regressed ***." The court took issue with Breanna's failure to follow the recommendation to transition from inpatient substance abuse treatment to a sober-living house. The court stated that Breanna's reasons for not moving into the sober-living setting amounted to "nonsense." The court found that the State established by clear and convincing evidence that Breanna was an unfit parent based upon her failure to make reasonable progress during the nine-month period from March 1, 2022, through December 1, 2022.

¶ 28    Immediately following the fitness hearing, the trial court held the best interest hearing. The State called one witness. Breanna testified on her own behalf and her attorney called Jasmine Roa for additional testimony.

¶ 29    Ashley H., Allen's aunt and A.R.'s foster parent, testified. A.R. has lived in her home since the inception of this case. She lives with her husband and two teenage children. Ashley H. testified that she and her husband are employed. A.R. currently stays with his paternal grandmother when Ashley H. is at work, but Ashley H. testified that they are looking for a traditional daycare for him. A.R. has his own bedroom, is affectionate and happy, and gets along with every family member. Ashley H.'s two children adore A.R. and spend time playing with him. Currently, A.R. only speaks a few words, and so he had been taught sign language to improve his ability to communicate. Ashley H. stated that A.R. was working with an early intervention educational specialist through CCAR Industries. Ashley H. testified that A.R. is healthy, and she and her husband plan to adopt A.R. if the trial court terminates Breanna's parental rights.

¶ 30    Breanna's attorney called caseworker, Jasmine Roa, to testify. Roa testified that DCFS did not originally place A.R. with Allen's mother (foster parent Ashely H.'s sister) because she had a 2003 methamphetamine conviction. However, Roa explained that DCFS approved her to provide daytime care for A.R. in her home when the foster parents were at work. Moreover, Roa stated that she had come to know Allen's mother through this case and stated that she was currently stable and that she had "zero concerns" about her ability to care for A.R.

¶ 31    Breanna testified that she loved A.R. and that through her supervised visits, she had established a bond with him. She stated that she believed it was in A.R.'s best interest to maintain a relationship with her.

¶ 32    At the conclusion of the hearing, the trial court noted the favorable evidence presented about A.R.'s needs and the H. family's care and love for him plus their willingness to adopt. The court found that it was in the best interest of A.R. to terminate Breanna's parental rights. On March 10, 2023, the court entered its written order changing the permanency goal to adoption.

¶ 33                                    II. ANALYSIS

¶ 34    Breanna appeals from the trial court's orders finding that she was an unfit parent and terminating her parental rights.

¶ 35    The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)) provide the legal authority for the involuntary termination of parental rights in Illinois. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re J.L.*, 236 Ill. 2d 329, 337 (2010)). Section 2-29 of the Juvenile Court Act of 1987 provides the procedural basis for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). The process mandated involves two hearings. In the first hearing, the State must prove by clear and convincing evidence that the parent is an "unfit person" as defined by the Adoption Act. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994)); 750 ILCS 50/1(D) (West 2020). If the trial court finds that the parent is unfit, the case proceeds to a second hearing where the State must prove, by a preponderance of the evidence, that it is in the child's best interest that the parent's rights be terminated. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re J.L.*, 236 Ill. 2d at 337-38); 705 ILCS 405/2-29(2) (West 2020).

¶ 36    When a parent appeals the trial court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the appellate court must not retry the case but, instead, must review the trial court's findings to determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re A.W.*, 231 Ill.

12

2d 92, 104 (2008)). The reviewing court gives great deference to the trial court's finding of unfitness because the court had the best opportunity to view and evaluate the parties and their testimony. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)). Therefore, we do not reweigh the evidence or reassess the credibility of the witnesses on appeal. *Id.* (citing *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001)). "A decision is contrary to the manifest weight of the evidence if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *Id.* (citing *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28).

¶ 37                                        A. Fitness

¶ 38    We first review the evidence to determine if the State met its burden of proving, by clear and convincing evidence, that Breanna was an "unfit person." The trial court determined that the State met its burden of proof on the following basis: that Breanna failed to make reasonable progress toward A.R.'s return within the specific nine-month period from March 1, 2022, to December 1, 2022, following the adjudication of neglect (750 ILCS 50/1(D)(b)(ii) (West 2020)).

¶ 39    Breanna argues that the trial court erred in finding that she was an unfit parent because she had completed parenting classes, was engaged in mental health and substance abuse services, and was employed.

¶ 40    The term "reasonable progress" requires an objective determination regarding the amount of progress based upon the conditions existing at the time the minor child's custody was removed from the parent. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47 (citing *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

" 'The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of

13

the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent.' " *Id.* (quoting *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

"A parent makes reasonable progress when the trial court can find that the progress 'is sufficiently demonstrable and of such a quality' that the trial court may soon be able to order the return of the minor to the parent's custody." *Id.* (quoting *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

¶ 41 The foundational issue in this case was substance abuse. DCFS became involved upon A.R.'s birth because his mother tested positive for methamphetamine after delivery. Upon further investigation, DCFS learned that Breanna had a history of methamphetamine addiction. She acknowledged that for at least the first month of A.R.'s pregnancy, and then for an unspecified period three months later, she used methamphetamine.

¶ 42 Without discounting the difficulty of methamphetamine addiction, Breanna made only minimal progress in this case, and made virtually no progress during the specific nine-month period in 2022. Jasmine Roa was Breanna's case manager for more than eight months of the specific nine-month period. During most of this time, Breanna was noncommunicative with Roa.

¶ 43 Since March 2022, Breanna had been dropped from outpatient substance abuse treatment multiple times. In the first few months of this nine-month period, Breanna had been consistently testing negative for drugs. However, Breanna eventually confessed that the negative results were not based upon her own urine samples. In July 2022, a caseworker transported Breanna to the area hospital and had the collection of the sample directly observed by hospital staff. That sample tested positive for methamphetamine and marijuana. Breanna then confessed to having relapsed. In July 2022 after the positive drug test, Breanna checked into an inpatient substance abuse program. She successfully completed this program by the end of August 2022. Upon completion of the program,

14

Breanna declined the recommended step to transition from the residential program to a sober-living facility. The sober-living facility would have monitored Breanna's progress and her compliance with the house rules. Instead, Breanna opted to stay with friends or acquaintances who had also struggled with addiction in an unmonitored setting. She testified that she had heard that someone had overdosed in the sober-living setting, and that the assistance of her friends would be better for her continued sobriety. The judge found this excuse to be "nonsense," and we agree with that assessment.

¶ 44    Since Breanna admitted to "cheating" on the drug tests in the past, DCFS required Breanna to have all future testing completed under direct observation. While Breanna tested negative for drugs on September 15, 2022, by October 11, 2022, she refused to submit to the observed drug test stating that she would "take the fail." She was then scheduled for another drug test on October 19, 2022, but failed to show. Between October 2022 and December 15, 2022, DCFS reported that Breanna was a no-show for seven required drug tests.

¶ 45    As this court recently noted, "[m]issed random drug tests, without a verified excuse, are inherently problematic for the parent required to test." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 49. It is not known whether Breanna purposefully skipped the drug tests because she knew she would test positive. Certainly, missing numerous scheduled drug tests reflects Breanna's lack of commitment to this process.

¶ 46    Because Breanna was skipping her scheduled drug tests, DCFS modified her supervised visitation schedule from two hours to one hour. DCFS indicated that if Breanna tested negative on three consecutive directly-observed drug tests, the extra hour of visitation with A.R. would be reinstated. Breanna failed to utilize the opportunity DCFS provided her.

15

¶ 47    Here, the trial court noted its concerns with Breanna rejecting the opportunity to move into a sober-living house and instead choosing to live with and/or surround herself with other recovering addicts outside the restrictions and monitoring of a sober-living setting. We also note that the record showed that Breanna was involved in a new personal relationship, after ending her relationship with A.R.'s father. While she claimed that this new paramour was a good influence, DCFS found that he had recently been arrested for possession of methamphetamine.

¶ 48    The record established that shortly after the State filed its petition to terminate Breanna's parental rights, she began working on her service plan objectives. Breanna engaged in mental health and outpatient substance abuse counseling services. Breanna was diagnosed with mental health issues in 2019 during an inpatient stay at the area hospital. During this case, she did not address the required mental health service plan objections until after the State filed its petition to terminate. Then, Breanna obtained and allegedly began taking prescription medication necessary to treat her conditions. She also obtained employment less than three weeks before the fitness hearing. However, Breanna still had no approved housing and was living with her mother. The record does not indicate if Breanna had sought DCFS approval of her mother's home as a placement for A.R.

¶ 49    Overall, Breanna's efforts to correct the substance abuse concerns that brought A.R. into this DCFS case immediately after birth were insufficient. Breanna's overall progress on her service plan objectives was minimal during the period from March 1, 2022, through December 1, 2022. In addition, her visitation schedule with A.R. was reduced because of substance abuse concerns. We conclude that the trial court's order finding that Breanna failed to show any progress toward correcting these conditions is not contrary to the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d at 104.

16

¶ 50                                   B. Best Interest

¶ 51    Termination of a parent's rights is a difficult and final step. *In re Adoption of Syck*, 138 Ill. 2d 255, 274-75 (1990). Parents maintain the important right to raise their own children. *Id.* However, when a parent has been declared "unfit," "the parent's rights must yield to the child's best interest." *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002); *In re J.L.*, 236 Ill. 2d 329, 337-38 (2010). The interests of the parent and the child remain concurrent "to the extent that they both 'share a vital interest in preventing erroneous termination of their natural relationship' " until the court declares that the parent is unfit. *In re D.T.*, 212 Ill. 2d 347, 363 (2004) (quoting *Santosky v. Kramer*, 455 U.S. 745, 760-61 (1982)).

¶ 52    At the best interest hearing, the State must establish proof that termination of a parent's rights is in the child's best interest by a preponderance of the evidence. 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d at 366. We review the trial court's best-interest decision with the manifest weight of the evidence standard. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009); *In re S.J.*, 368 Ill. App. 3d 749, 755 (2006). A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *In re Daphnie E.*, 368 Ill. App. 3d at 1072. On appeal from an order terminating a parent's rights, the reviewing court gives great deference to the trial court's decision because the trial court was in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000).

¶ 53    "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. The trial court must analyze several factors within "the context of the child's age and developmental needs" when considering if termination of parental rights serves a child's best

17

interest. 705 ILCS 405/1-3(4.05) (West 2020). Another factor the trial court may consider is the likelihood of adoption. *In re Tashika F.*, 333 Ill. App. 3d at 170.

¶ 54    During the best interest hearing, Breanna testified that she loved A.R. We do not have reason to doubt this testimony. However, the trial court found that A.R.'s current relative foster home provided a more permanent and appropriate placement, and that the foster parents were willing to adopt him. The court noted that the foster parents were married, had two children, and were both employed. A.R. would have his own bedroom and would have two older siblings who currently enjoy playing and interacting with him. The court stated that the foster parents had already addressed A.R.'s speech issues by setting up early intervention services for him. The trial court found that it was in A.R.'s best interest, by the preponderance of the evidence, to terminate Breanna's parental rights.

¶ 55    Here, the record clearly establishes that termination of Breanna's parental rights was the appropriate outcome for A.R. We conclude that the trial court's decision to terminate Breanna's parental rights was not contrary to the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002).

¶ 56                                    III. CONCLUSION

¶ 57    For the foregoing reasons, we affirm the judgments of the circuit court of Coles County finding that Breanna was an unfit parent, and that the best interest of A.R. required the termination of her parental rights.

¶ 58    Affirmed.

18