NOTICE
Decision filed 09/01/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 230319-U

NO. 5-23-0319

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* S.G., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Jackson County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20-JA-21 |
| | ) | |
| Bonnie B., | ) | Honorable |
| | ) | Ella L. Y. Travelstead, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Presiding Justice Boie and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where the trial court's orders finding that Bonnie B. was an unfit parent, and that the best interest of the minor child warranted termination of her parental rights, were not contrary to the manifest weight of the evidence, we affirm the orders.

¶ 2    Bonnie B. (Bonnie) is the mother of S.G., a female child. The Department of Children and Family Services (DCFS) had an intact family case open in this case. Bonnie and S.G. lived in public housing. Bonnie repeatedly allowed individuals to move in and out of this apartment, which was in a chronic unsanitary condition. After someone reported that Bonnie had been smoking methamphetamine, DCFS had her tested, and she tested positive for methamphetamine. S.G. was then removed from Bonnie's home and placed in protective custody.

1

¶ 3    Due to Bonnie's failure to make reasonable progress towards the return of S.G. to her care, the State filed its motion to terminate her parental rights. After the trial court found that Bonnie was an unfit parent, the court concluded that it was in S.G.'s best interest to terminate Bonnie's parental rights. Bonnie appeals from these orders.

¶ 4                                I. BACKGROUND

¶ 5    S.G. was born on March 25, 2016. Her mother is Bonnie and her father is Kent G. (Kent).[1] DCFS became involved in this case in early 2019. An intact family case was instigated and DCFS implemented a safety plan for Bonnie to address the issues that were threatening S.G. In the months before DCFS took S.G. into protective custody, DCFS was sent to Bonnie's apartment several times to respond to concerns about S.G.'s safety. On June 22, 2020, DCFS was again called to Bonnie's apartment, which continued to be cluttered with food, dirty dishes, garbage, clothing, and other debris "rendering the residence unsafe for the minor child." DCFS removed S.G. from Bonnie's home on that date. On June 23, 2020, DCFS filed its petition asking the court to adjudicate S.G. as a neglected minor pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2020)) and to place her in shelter care.

¶ 6    On June 24, 2020, the trial court held the shelter care hearing and found that there was probable cause to believe that S.G. was a neglected minor and there was an immediate and urgent necessity supporting her removal from Bonnie's home. Temporary custody of S.G. was placed with DCFS.

¶ 7    The trial court held the adjudicatory hearing on October 7, 2020. Bonnie stipulated that the evidence would be substantially similar to the evidence at the shelter care hearing. The court

_____

[1]On April 25, 2023, Kent formally surrendered his parental rights to S.G. and is not a party to this appeal.

2

entered its adjudicatory order finding that S.G. was a neglected minor and that it was in her best interest to remain in the custody of DCFS.

¶ 8 On October 30, 2020, DCFS filed its dispositional report. In addition to the reports that Bonnie smoked methamphetamine around S.G. and allowed people to move into her apartment, which was in an unsanitary condition, there were also reports that four-year-old S.G. had been seen wandering the neighborhood by herself. DCFS determined that Bonnie's service needs were to obtain and maintain housing, undergo parental training, obtain a substance abuse assessment and submit to random drug tests, obtain a domestic violence assessment, obtain a mental health assessment, obtain a psychological assessment, and engage in visitation with S.G.

¶ 9 Bonnie had begun parenting instruction in her home with Project 12-Ways, but the instructor reported on September 17, 2020, that Bonnie could not keep the apartment clean. Project 12-Ways indicated that the focus would shift from the entire apartment to just the living room and kitchen, that they would create a checklist for Bonnie, and planned to teach Bonnie structure and cleaning skills.

¶ 10 Bonnie was proactive with the mandated random drug tests and had tested negative 15 times since July 15, 2020. Because she had consistently tested negative, DCFS did not require her to complete a substance abuse evaluation. Bonnie also indicated that she would contact The Women's Center to make an appointment for domestic violence counseling. Bonnie planned to use Centerstone for her mental health assessment.

¶ 11 Bonnie had supervised visitation with S.G. two times weekly for a total of four hours. S.G. remained in the foster home where she was initially placed in June 2020. DCFS reported that she was adjusting well in this placement. On November 4, 2020, the trial court held a dispositional

hearing, at the conclusion of which the court entered its order finding that S.G. was a neglected minor, and guardianship and custody were placed with DCFS.

¶ 12    DCFS filed a permanency report on April 5, 2021, providing the substantive background for its involvement with Bonnie, who was reported to have developmental delays and a social security disability. Bonnie had Adult Protective Services involved in her own care. In 2018, Bonnie was in a shelter because of domestic abuse by S.G.'s biological father, Kent. In the shelter, Bonnie met a woman named Crystal. Thereafter, in June 2018, Crystal and her boyfriend, David, began living with Bonnie and S.G. Adult Protective Services got involved on Bonnie's behalf because Crystal and David were financially exploiting her. Crystal and David were suspected substance abusers. In January 2019, Bonnie was physically assaulted by a third party in her apartment. Agency advocates working with Bonnie called a team meeting to attempt to extract her from this home. Bonnie refused to go into a shelter again because she believed that Kent was going to provide her with a trailer in which she and S.G. could live. No trailer was provided so Bonnie advised that she was going to go to a hotel and stay with a sex offender named Robert. Whether she went to this hotel was not indicated in the report. The agency advocates reported that there was no familial support for Bonnie.

¶ 13    DCFS reported that though Bonnie remained active in parenting education with Project 12-Ways, in its mid-March 2021 report, the agency stated its intent to close Bonnie out from service because of her ongoing difficulties to retain information. Project 12-Ways reported that the home had major environmental issues and was constantly unclean. Overall, Bonnie was stagnant in progressing in the program. Bonnie informed DCFS that she had contacted the approved agency to schedule individual psychotherapy. DCFS was waiting for written approval to schedule Bonnie for a psychological exam. Bonnie had tested negative on all weekly drug tests. Bonnie currently

4

lived in public housing, but had received an eviction notice due to the home's condition—animal feces, moldy food in dishes, trash and debris in the living room and kitchen, and fruit flies and roaches within the home. Bonnie was consistent with her visits with S.G. However, ADDUS HOMECARE (ADDUS), the entity supervising the visits, raised concerns about Bonnie's relationship with someone named Johnny with whom she had video calls during the supervised visits. Bonnie asked S.G. to refer to Johnny as "New Daddy." During one video call, Johnny was directing Bonnie to take $500 from her bank account or he would leave her for a different woman who would give him the money.

¶ 14    Overall, DCFS reported its concerns that Bonnie struggled with the ability to properly and safely parent S.G. Bonnie received assistance from Adult Protective Services and had a payee through Shawnee Alliance who managed Bonnie's bills. DCFS asked the trial court to remove the weekly drug tests order and to allow DCFS to schedule monthly random drug tests.

¶ 15    The court entered its order on April 29, 2021, maintaining the permanency goal to return S.G. home within 12 months. Custody and guardianship of S.G. was ordered to remain with DCFS. The court modified the drug testing requirements to allow DCFS the discretion for scheduling.

¶ 16    On August 27, 2021, Dr. Nikki Hernandez, a psychologist, filed her court-ordered report. Bonnie was 44 years old when she was tested and evaluated. State agencies were involved with Bonnie and her mother when Bonnie was a child. Bonnie's mother had mental health issues. She lived with her mother in and out of shelters until she turned 18. Bonnie reported a history of being sexually molested by her biological father. Both of Bonnie's parents were deceased, and although she did have siblings, she did not know their names or whereabouts. Bonnie reported that she had never been married and her only significant relationship was with S.G.'s father, Kent, which lasted from 2015 to 2018. Bonnie claimed that Kent was physically and emotionally abusive. Bonnie has

never been arrested. Although Bonnie tested positive for methamphetamine one time, she was unable to explain that result.

¶ 17    Overall, Bonnie's cognitive and academic functioning was extremely low. Her adaptive functioning was also extremely low, including the tests for "use of community, home and school functioning, self-care, and health and safety." Testing established that Bonnie met the criteria for a diagnosis of mild intellectual disability and that she "evidenced significant deficits with relation to adaptive functioning, particularly in the areas of including conceptual and practical functioning." The psychologist indicated that these deficits left Bonnie vulnerable for problems including "understanding rules/societal norms, the ability to navigate the tasks of daily living, and appropriately participating in family, school, and community activities." Noting that these functional impairments are lifelong, the report indicated that Bonnie's deficits require support and "make independent parenting unlikely and unsafe." Moreover, these intellectual deficits "significantly impede [Bonnie's] *** ability to *** benefit from parenting instruction."

¶ 18    On September 8, 2021, DCFS filed its next permanency report. As of that date, Bonnie had been closed out of parenting education with Project 12-Ways because she could not retain information. DCFS had received no documentation to establish that Bonnie was engaged in individual psychotherapy. Bonnie's home continued to be cluttered and unclean. Bonnie maintained regular visitation with S.G. DCFS expressed its ongoing concerns that Bonnie lacked the ability to identify "safe" adults to be around S.G. and herself. The trial court was asked to continue custody and guardianship with DCFS. The trial court entered its permanency order on September 20, 2021, later amended on September 22, 2021, finding that the goal remained to return S.G. home within 12 months. However, the court noted that Bonnie was making little progress and

6

that there were concerns about her ability to provide S.G. with a safe home. The court continued custody and guardianship of S.G. with DCFS.

¶ 19    DCFS filed a permanency report on December 13, 2021. Bonnie completed her psychotherapy assessment through Centerstone with no recommendations for treatment. Bonnie recently applied for housing at a different site in Carbondale. Bonnie continued to exercise her visitation with S.G. Following the hearing, on December 16, 2021, the trial court maintained the same goal of returning S.G. home within 12 months and maintaining custody and guardianship with DCFS.

¶ 20    DCFS filed its next permanency report on May 12, 2022. Since the previous report and court hearing, DCFS had started to mandate random drug tests. Bonnie was uncooperative. In order to submit to a drug test, it was necessary for Bonnie to establish her identity. Bonnie apparently had no identification and therefore was unable to comply. Bonnie also complained that she needed more time to get to the service location than was being allowed. Bonnie had successfully moved to her new apartment, but within a short period of time, the apartment strongly smelled of ammonia, was littered with trash, dirty dishes, and spoiled food. Food was also found in Bonnie's bed and bathroom. Bonnie would remove and discard her used adult diapers throughout the apartment, and the kitchen and bathroom sinks were being used as trash containers. DCFS noted that Bonnie simply did not seem to understand these issues as she stated that her home was clean. ADDUS had provided Bonnie with a habilitation worker, although despite diligent efforts, Bonnie was unable to maintain cleanliness and personal hygiene. Additionally, the ADDUS worker was attempting to teach Bonnie cooking skills but noted that the efforts were not successful because Bonnie struggled to read and comprehend directions on the food packages. In addition to the hygiene issues, the individuals who were living with Bonnie at the beginning of the case—Crystal

7

and David—were living with her again in the new apartment. Crystal and David reportedly used methamphetamine and had left their child in Bonnie's care over a weekend. DCFS noted that while they wanted to engage in unannounced visits to confirm these reports, the entrance to the Carbondale apartment building was locked and could only be accessed if a tenant provided access. Bonnie continued to utilize her supervised visits with S.G. The visits were currently being supervised by ADDUS workers who reported that Bonnie had no ability to parent S.G. and described the visits as requiring the workers to "supervise two children." Because of the environmental issues within Bonnie's apartment, ADDUS was directed to have future visits in community locations. The court's May 19, 2022, permanency order directed no changes to the permanency goal and maintained custody and guardianship of S.G. with DCFS.

¶ 21    The next permanency report was filed on August 12, 2022. Bonnie had five random drug tests from May 20, 2022, through July 27, 2022. All results were negative. The apartment sanitation issues continued to be a major issue. In addition, DCFS was informed that a child was seen in Bonnie's bed. While Bonnie denied that anyone else was staying at her apartment and informed DCFS that she only sees this child and his or her parents on weekends, DCFS noted that these people have been seen in her apartment during the week. Habilitation services were closed out by ADDUS because of Bonnie's inability to follow basic instructions. Visitation was now being conducted at a public library. ADDUS noted that Bonnie lacked the knowledge of age appropriateness and was unable or unwilling to correct negative behaviors exhibited by S.G. Visitation time was cut from four to two hours weekly. DCFS stated that Bonnie could earn back the lost two hours "if she can follow A[DDUS] parenting expectations while on supervised visits." DCFS also noted that Bonnie had become uncooperative and had started to disallow scheduled and unscheduled home visits. On one occasion, DCFS heard a television on inside the apartment

8

and heard Bonnie tell a child to "hush," but Bonnie did not answer the door or answer her phone. On one occasion, the DCFS worker went to the apartment to conduct a wellness check and maintenance staff let her in. When the DCFS worker got inside the apartment, she noted that a child and two adults were in the apartment sleeping. On another occasion, although Bonnie denied that she was in a romantic relationship with Kent, the DCFS worker found Kent was asleep in Bonnie's bed.

¶ 22　On September 6, 2022, the trial court held a permanency hearing. Based upon the report filed by DCFS, the fact that S.G. had been in foster care for two years, and because the case just passed the DCFS legal screening process, the trial court changed the permanency goal to substitute care pending termination of parental rights.

¶ 23　On December 6, 2022, DCFS filed a permanency report. Bonnie continued to test negative on random drug tests. DCFS visited her apartment in early December 2022 and found that the conditions of the apartment had not improved. Bonnie became uncooperative with her habilitation services, and she was unsuccessfully closed out of the program.

¶ 24　On December 14, 2022, DCFS filed a family service plan consistent with the changed permanency goal. DCFS concluded that Bonnie had made satisfactory progress in obtaining mental health and psychological assessments, participating in random drug tests, providing signed consent forms, and participating in supervised visitation with S.G. Bonnie was rated as having made unsatisfactory progress on all other service plan objectives including parenting classes, obtaining a domestic violence assessment, provision of appropriate food for S.G. at visits, and maintenance of a clean and safe residential environment.

¶ 25　On January 19, 2023, DCFS formally filed its petition seeking to terminate Bonnie's parental rights. The petition alleged that Bonnie was unfit in that she had failed to maintain a

reasonable degree of interest, concern, or responsibility as to S.G.'s welfare (750 ILCS 50/1(D)(b) (West 2020)) and that she had had failed to make reasonable progress toward S.G.'s return during any nine-month period following the adjudication of neglect, and specifically between March 1, 2022, to November 30, 2022 (*id.* § 1(D)(m)(ii)).

¶ 26    On April 25, 2023, the trial court held the hearing on the State's petition to terminate Bonnie's parental rights. The State called DCFS child welfare specialist, Gibraltar Taylor, who testified that the case had been open for three years, and he had been assigned for the last year. He confirmed that Bonnie had been discharged unsuccessfully from the parenting program; that she was not always compliant with her random drug screens, completing only 5 of 10 in the past nine months; and that her home remained unclean and unsafe despite the habilitation worker assigned to her. In short, Taylor testified that Bonnie was no closer to the return of her child, and that between March 1, 2022, and November 30, 2022, Bonnie did not successfully complete any services.

¶ 27    Bonnie also testified at the fitness hearing. She testified that she complied with the random drug tests. She confirmed that DCFS provided her with a housing advocate but testified that she found the Carbondale apartment on her own without the advocate's assistance. Bonnie testified that at times the water service had been turned off in her apartment. She also sometimes was out of dishwashing soap, and she could not clean dishes until she had money to buy soap. Bonnie testified about her payee who pays her bills and puts money into her account. She complained of the delay between her request for money and her access to the money.

¶ 28    At the conclusion of the fitness hearing, the trial court concluded that Bonnie was unfit based upon the pleadings and evidence because she had not maintained a reasonable degree of interest, concern, or responsibility as to S.G.'s welfare (*id.* § 1(D)(b)), and because she failed to

10

make reasonable progress toward the return of S.G. to her home during a nine-month period (March 1, 2022, through November 30, 2022) following the adjudication of neglect (*id.* § 1(D)(m)(ii)).

¶ 29 The trial court next held the best interest hearing. The State called DCFS child welfare specialist, Gibraltar Taylor, who testified that S.G. was doing well in her foster home. S.G. was also doing well in school, engaged in extracurricular activities, was happy, and was loved by her foster parents. Taylor stated that the foster parents were a potential adoptive home. Both parents were employed, and S.G.'s medical and emotional needs were being met. Taylor testified that S.G. was then seven years old and had indicated that she wanted to be adopted by her foster parents. Taylor indicated that in his professional opinion, it was in S.G.'s best interest for Bonnie's parental rights to be terminated.

¶ 30 Bonnie also testified at the best interest hearing. She testified that she remained close to S.G. and that at every visit, S.G. told her that she wanted to spend more time with her and wanted to come home to live with Bonnie and with her dog, Buddy.

¶ 31 At the conclusion of the hearing, the trial court found by a preponderance of the evidence that it was in S.G.'s best interest to terminate Bonnie's parental rights. The court placed S.G. in the guardianship of DCFS and granted the guardian the power to consent to S.G.'s adoption. The court changed the permanency goal to adoption. Bonnie appeals from the trial court's orders finding that she was an unfit parent and terminating her parental rights.

¶ 32                                      II. ANALYSIS

¶ 33 The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)) provide the legal authority for the involuntary termination of parental rights in Illinois. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re*

*J.L.*, 236 Ill. 2d 329, 337 (2010)). Section 2-29 of the Juvenile Court Act of 1987 provides the procedural basis for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). The process mandated involves two hearings. In the first hearing, the State must prove by clear and convincing evidence that the parent is an "unfit person" as defined by the Adoption Act. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994)); 750 ILCS 50/1(D) (West 2020). If the trial court finds that the parent is unfit, the case proceeds to a second hearing where the State must prove, by a preponderance of the evidence, that it is in the child's best interest that the parent's rights be terminated. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re J.L.*, 236 Ill. 2d 329, 337-38 (2010)); 705 ILCS 405/2-29(2) (West 2020).

¶ 34    When a parent appeals the trial court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the appellate court must not retry the case but, instead, must review the trial court's findings to determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re A.W.*, 231 Ill. 2d 92, 104 (2008)). The reviewing court gives great deference to the trial court's finding of unfitness because the court had the best opportunity to view and evaluate the parties and their testimony. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)). Therefore, we do not reweigh the evidence or reassess the credibility of the witnesses on appeal. *Id.* (citing *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001)). "A decision is contrary to the manifest weight of the evidence if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *Id.* (citing *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28).

¶ 35                                    A. Fitness Hearing

¶ 36    We first review the evidence to determine if the State met its burden of proving, by clear and convincing evidence, that Bonnie was an "unfit person." The trial court determined that the State met its burden of proof on the following two bases: (1) that Bonnie failed to maintain a reasonable degree of interest, concern, or responsibility as to S.G.'s welfare (750 ILCS 50/1(D)(b) (West 2020)); and (2) that Bonnie failed to make reasonable progress toward S.G.'s return within the specific nine-month period from March 1, 2022, to November 30, 2022, following the adjudication of neglect (*id.* § 1(D)(m)(ii)).

¶ 37                    1. *Reasonable Degree of Interest, Concern, or Responsibility*

¶ 38    The language used by our legislature in section 1(D)(b) of the Adoption Act is in the disjunctive, meaning that any one of the three separate segments—interest or concern or responsibility—"may be considered by itself as a basis for unfitness." *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31 (citing 750 ILCS 50/1(D)(b) (West 2012); *In re Richard H.*, 376 Ill. App. 3d 162, 166 (2007)). To determine if a parent has shown a reasonable degree of interest, concern, or responsibility for a minor's welfare, the court "considers the parent's efforts to visit and maintain contact with the child as well as other indicia, such as inquiries into the child's welfare." *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064). The court can also consider evidence that the parent completed his or her service plan as establishing the parent's interest, concern, or responsibility. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1065). A parent's effort is more important than a parent's success with the service plan objectives. *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990)). "In this regard, the court examines the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred." *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d at 278). Circumstances of the parent's difficulties in completion of plan objectives

13

and/or in attending visitation, including transportation issues and poverty, are relevant in assessing the reasonable degree of a parent's interest, concern, or responsibility for the minor's welfare. *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d at 278-79). "We are mindful, however, that a parent is not fit merely because he or she has demonstrated some interest or affection toward the child." *Id.* (citing *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004)). Instead, the court must objectively assess whether the interest, concern, or responsibility is reasonable. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064).

¶ 39    While this case began in part with a suspected substance abuse problem, the primary problem was the safety and cleanliness of housing. Bonnie tested positive for methamphetamine when S.G. was removed from Bonnie's care, but she never tested positive again. However, Bonnie's housing issues never improved despite access to Adult Protective Services and DCFS resources.

¶ 40    Bonnie underwent comprehensive psychological testing that revealed extremely low cognitive, adaptive functioning, and academic abilities. Dr. Hernandez indicated that these deficits resulted in Bonnie's difficulty in dealing with daily tasks, that Bonnie would require ongoing support, and that her ability to independently parent S.G. would be "unlikely and unsafe." Bonnie seemingly had no ability to ascertain that other adults who moved into her apartment or requested money from her were doing so with possible ill intent. At the beginning of the case, a couple who were addicts were living with Bonnie, even though she was not allowed to have roommates pursuant to her public housing contract. Later, a couple with a child, believed to be the same couple, were seen several times in Bonnie's new apartment. If the caseworker asked Bonnie about the child or the couple, Bonnie would deny that they were staying with her.

¶ 41    Bonnie was provided with parenting services through Project 12-Ways, and she was also provided with specialized habilitation services by ADDUS. Bonnie was eventually dropped from both services. The reasons both Project 12-Ways and ADDUS ended their services were virtually identical. Bonnie had no ability to retain the most basic of cleaning and cooking information, failed to keep any portion of the house clean, and used sinks and the floor as repositories for trash, including used toilet paper and Bonnie's adult diapers. The filth was made worse by the fact that Bonnie would not clean dirty dishes, which allowed mold to grow and attracted insects. In addition, Bonnie had a dog, and workers reported that the home smelled of dog urine. When asked why she did not follow through with the cleaning training she received from the providers, Bonnie would cite to a lack of money to buy dishwashing soap and once claimed that her water was shut off. Bonnie was evicted from the apartment she had when the case began because of the lack of sanitation, and shortly after moving to the latest apartment, it was also full of trash and debris. Workers asked Bonnie about the status of her home, but Bonnie seemed to believe that despite the conditions at issue, the apartment was clean. Given those responses, Bonnie seemingly never understood what was preventing her from completion of these housing-based services. The fact that Bonnie did not complete these critical services required by DCFS supports the trial court's conclusion that Bonnie did not exhibit a reasonable degree of interest, concern, or responsibility for S.G. 750 ILCS 50/1(D)(b) (West 2020); *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31 (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1065).

¶ 42    Bonnie consistently used her visitation opportunities with S.G. In that respect, Bonnie seemed to exhibit a reasonable degree of interest, concern, or responsibility for her daughter. 750 ILCS 50/1(D)(b) (West 2020). However, considering the trash and other unclean aspects of Bonnie's newest apartment, visitation was moved out of Bonnie's apartment for S.G.'s safety, and

15

the number of hours of visitation was decreased. Bonnie was advised that if her apartment could be brought up to the safety standards relative to cleanliness, she could gain back her extra visitation hours. However, the state of Bonnie's apartment never improved, and thus Bonnie's visitation with S.G. remained reduced. In addition, the ADDUS supervisors of the visitation sessions were frustrated by Bonnie's refusal or inability to maintain control and consistency with S.G. Of note, the workers found that they were supervising "two children" during those sessions in that Bonnie's cognitive disabilities resulted in her own childlike behavior. We are reminded that Bonnie's cognitive struggles must be considered in determining if she showed that she had a reasonable degree of interest, concern, or responsibility for her daughter. *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31 (citing *In re Adoption of Syck*, 138 Ill. 2d at 278-79). As stated earlier in this order, "[W]e are mindful, however, that a parent is not fit merely because he or she has demonstrated some interest or affection toward the child." *Id.* (citing *In re Jaron Z.*, 348 Ill. App. 3d at 259). We find that despite Bonnie's interest in engaging in visitation, the facts of this case support the trial court's conclusion that Bonnie did not exhibit a reasonable degree of interest, concern, or responsibility for S.G. 750 ILCS 50/1(D)(b) (West 2020).

¶ 43    We must give great deference to the trial court's finding of unfitness, as the court was able to evaluate the demeanor and testimony of Bonnie and her case specialist, Taylor. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064). We conclude that the trial court's finding that Bonnie was unfit because she failed to establish a reasonable degree of interest, concern, or responsibility for S.G. is not against the manifest weight of the evidence. *Id.* (citing *In re A.W.*, 231 Ill. 2d at 104).

16

¶ 44                    2. *Reasonable Progress Within a Nine-Month Period*

¶ 45    The term "reasonable progress" requires an objective determination regarding the amount of progress based upon the conditions existing at the time the minor child's custody was removed from the parent. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47 (citing *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

> " 'The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent.' " *Id.* (quoting *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

"A parent makes reasonable progress when the trial court can find that the progress 'is sufficiently demonstrable and of such a quality' that the trial court may soon be able to order the return of the minor to the parent's custody." *Id.* (quoting *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

¶ 46    The foundational issue in this case was the safety and cleanliness of Bonnie's housing. DCFS became involved via an intact family case in early 2019. By late June 2020, Bonnie's housing situation had deteriorated, and DCFS took S.G. into protective custody.

¶ 47    Here, Bonnie was successful in having the psychological testing and a mental health assessment. Although she initially tested positive for methamphetamine, she never tested positive again despite numerous random drug tests. There came a time where Bonnie felt that she was not being given enough time to arrange for transportation or to obtain a new Illinois identification card, which was required for the drug tests, and so DCFS marked those tests as missed. However, she

soon began submitting to drug tests again, and as before, all test results were negative. Bonnie was also consistent with visitation sessions with S.G.

¶ 48    At issue from the time that this case was being labeled as an intact family case in 2019 was the safety and cleanliness of Bonnie's apartment. Bonnie's cognitive difficulties factored into her inability to understand how to keep her apartment clean, or how to read the directions on boxes for food preparation purposes. Regardless, Bonnie was aware that she was required to work with the Project 12-Ways and ADDUS service providers, and yet she could not, or would not, comply with the standards of cleanliness required to keep S.G. safe.

¶ 49    Additionally, Bonnie had issues with other individuals taking financial advantage of her. When she stayed in a homeless shelter, she met a couple who eventually moved in with her. The couple were substance abusers and used Bonnie's access to money for themselves. Despite the involvement of the overseer of Bonnie's money and bills, this couple, and then later the man named "Johnny" who demanded $500 via a video call during a visitation session, continued to take financial advantage of Bonnie. Involvement with these opportunistic individuals was part of the foundational reasons that S.G. was removed from Bonnie's home, as DCFS was concerned that S.G. was not living in a safe environment.

¶ 50    Overall, Bonnie's efforts to correct the housing issues that brought S.G. into this DCFS case were insufficient. Bonnie's overall progress on her service plan objectives was nonexistent during the nine-month period from March 1, 2022, to November 30, 2022. In addition, her visitation schedule with S.G. was reduced because of these housing and safety concerns. Reasonable progress is established when the trial court finds that progress " 'is sufficiently demonstrable and of such a quality' that the trial court may soon be able to order the return of the minor to the parent's custody." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47 (quoting *In re D.T.*,

2017 IL App (3d) 170120, ¶ 17). In this case, Bonnie was no closer to having S.G. returned to her custody than she was in late June 2020 when DCFS removed S.G. from her home.

¶ 51    We conclude that the trial court's order finding that Bonnie failed to show any progress toward correcting these conditions is not contrary to the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d at 104.

¶ 52                                 B. Best Interest Hearing

¶ 53    Termination of a parent's rights is a difficult and final step. *In re Adoption of Syck*, 138 Ill. 2d at 274-75. Parents maintain the important right to raise their own children. *Id*. However, when a parent has been declared "unfit," "the parent's rights must yield to the child's best interest." *In re Tashika F*., 333 Ill. App. 3d 165, 170 (2002); *In re J.L.*, 236 Ill. 2d at 337-38. The interests of the parent and the child remain concurrent "to the extent that they both 'share a vital interest in preventing erroneous termination of their natural relationship' " until the court declares that the parent is unfit. *In re D.T*., 212 Ill. 2d 347, 363 (2004) (quoting *Santosky v. Kramer*, 455 U.S. 745, 760-61 (1982)).

¶ 54    At the best interest hearing, the State must establish proof that termination of a parent's rights is in the child's best interest by a preponderance of the evidence. 705 ILCS 405/2-29(2) (West 2020); *In re D.T*., 212 Ill. 2d at 366. We review the trial court's best-interest decision with the manifest weight of the evidence standard. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009); *In re S.J.*, 368 Ill. App. 3d 749, 755 (2006). "A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 53 (citing *In re Daphnie E*., 368 Ill. App. 3d at 1072). On appeal from an order terminating a parent's rights, the reviewing court gives

19

great deference to the trial court's decision because the trial court was in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000).

¶ 55    "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. The trial court must analyze several factors within "the context of the child's age and developmental needs" when considering if termination of parental rights serves a child's best interest. 705 ILCS 405/1-3(4.05) (West 2020). Another factor the trial court may consider is the likelihood of adoption. *In re Tashika F.*, 333 Ill. App. 3d at 170.

¶ 56    During the best interest hearing, Bonnie testified that she remained close to S.G. We do not have reason to doubt this testimony. However, the trial court found that S.G.'s current foster home provided a more permanent and appropriate placement, and that the foster parents were willing to adopt her. The court noted that the foster parents were both employed. S.G. was their only child, and S.G. had indicated that she wanted to be adopted by her foster parents. DCFS child welfare specialist, Taylor, testified that S.G. was now seven years old and enrolled in school and extracurricular activities. Her medical and emotional needs were being met in this placement.

¶ 57    Here, the record clearly establishes that termination of Bonnie's parental rights was the appropriate outcome for S.G. S.G.'s safety and stability were of paramount importance, and her foster parents provided her with both. Further, S.G.'s foster parents plan to adopt her, which will provide her with permanence. We conclude that the trial court's decision to terminate Bonnie's parental rights was not contrary to the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002).

¶ 58                                    III. CONCLUSION

¶ 59    For the foregoing reasons, we affirm the judgments of the circuit court of Jackson County

finding that Bonnie was an unfit parent and that the best interest of S.G. required the termination

of her parental rights.


¶ 60    Affirmed.